## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| IN RE:         )<br>         )<br>         )<br>**SONYA PORRETTO,**  )<br>         )<br>**DEBTOR.**     )<br>         ) | **CHAPTER 7**<br><br>**CASE NO.  09-35324** |

| | |
|---|---|
| **SONYA PORRETTO,**  )<br>         )<br>**PLAINTIFF,**  )<br>**Vs.**      )<br>         )<br>**THE GALVESTON PARK BOARD OF** )<br>**TRUSTEES, CITY OF GALVESTON,** )<br>**TEXAS GENERAL LAND OFFICE AND** )<br>**GEORGE B. BUSH, LAND**  )<br>**COMMISSIONER OF THE TEXAS**  )<br>**GENERAL LAND OFFICE,**  )<br>         )<br>**DEFENDANTS.**  )| **ADVERSARY CASE NO.  21-03458** |

### THIRD AMENDED COMPLAINT

### I.     NATURE OF THE ACTION

This case arises from Defendants' unrestrained hubris before and during the Bankruptcy, as well as after the Chapter 7 Trustee abandoned the Porretto Beach Property. Ms. Sonya Porretto, the Plaintiff and Debtor, initially filed Bankruptcy due to the multi-year expensive contested litigation with the Defendants defending her ownership rights over the property and other skirmishes with the Defendants due to their interference attempting to limit her use, control, and operation of Porretto Beach.

The Defendants engaged in actions which damaged Porretto Beach, including but not limited to:

i) the State knowingly asserting a bogus claim of ownership only to later withdraw such claim without explanation;

ii) all Defendants used Porretto Beach in funding applications making false allegations regarding the property to devalue and assert control over Porretto Beach to support their funding requests to obtain funds for a public purpose with no benefit to Porretto Beach;

iii) the Park Board's improper sand mining from Porretto Beach and surrounding beaches which decreases the growth of Porretto Beach to manufacture false erosion ratings to support applications for government funds for "renourishment";

iv) creating false erosion and accretion rates damaging Porretto Beach's value by under-reporting its accretion by impacting potential uses, rights, permitting, funding, etc.;

v) obstructing Ms. Porretto's use, control and disposition of Porretto Beach before the Bankruptcy, after the Bankruptcy, and after Porretto Beach was abandoned by the Trustee back to Ms. Porretto, including but not limited to denying services provided to other property owners such as water hook-up or trash removal, harassment, asserting violations or "red tags" to prevent use, and threats of taking legal action for operating the beach in the same way it had been operated for decades without any dispute from the Defendants; and,

iv) deliberately flooding the Porretto Beach parking area in May 2021 with further construction planned for Stewart Beach which will further negatively impact Porretto Beach.

In early 2021, Ms. Porretto worked on restoring the section of Porretto Beach from 6th to 10[th][1] Street to reopen by Spring Break 2021. However, by March 2021, the harassment she faced from the City and Park Board was undeniable.

By May 2021, over the objection of Ms. Porretto and other citizens, including residents of Grand Preserve[2], the Defendants went forward with a construction project at Stewart Beach's parking area with full knowledge it would cause flooding of neighboring properties. The project was designed to flood Porretto Beach's parking area and surrounding property to limit Ms. Porretto's use of the property during one of the biggest tourist weeks for the tourist season – Memorial Day 2021, as well as the rest of the 2021 Summer Season[3]. The Park Board's actions

---

[1] The land where Porretto Beach is located dates back to before Texas' statehood. As the original streets that were designated at the time Menard owned the property and maps have changed and do not match up with modern maps because the shore was extended through public works projects creating what is now known as East Beach.

[2] A residential development of high-end homes on the East side of Stewart Beach.

[3] This limits Porretto Beaches ability to host weddings, corporate events, get sponsorships to improve te land, and host other music and special events.

created conditions that prevented parking, increased mosquitos, and made the beach look less inviting to tourists.

The flooding was exacerbated by the Defendants' actions in the years prior, including mining sand from Porretto Beach. Ms. Porretto complained of Defendants' actions damaging the property during the Bankruptcy. The sand mining and other actions of the Defendants which were denied at the time Ms. Porretto raised concerns created false erosion ratings assisting the Defendants in obtaining over $20 million in funding for beach projects in Galveston during the the time this Chapter 7 case has been pending.

Currently, the Defendants are seeking an additional $16 million to "repair" Stewart Beach from self-cannibalizing damage caused by sand mining and "messing with mother nature." Porretto Beach's significant accretion and exponential land growth were a problem for Stewart Beach. Stewart Beach is directly adjacent to Porretto Beach 6th to 10th on the West. Since the Park Board was removed from "maintaining" the shore by order of the Bankruptcy Court in the captioned case, Porretto Beach 6th 10th Street has increased in size from about 9 acres to 18 acres. Additionally, Ms. Porretto faced a legal quagmire with mitigating the damage given the false data the Defendants developed is used in the moving and relocating sand permit process.

The Defendants, individually and in concert, have taken actions designed to devalue Porretto Beach without compensation. Porretto Beach is prime developable Galveston beachfront land with expansive frontage on the Gulf in a tourist town reportedly on the short list every time casinos[4] are discussed in Texas. Porretto Beach is rich in sand. After water, sand is the most used

---

[4] A concerted heavily funded casino legislation lobbying effort was initiated in 2020-2021 during the last legislative session but ultimately did not move forward. https://www.texastribune.org/2021/05/11/texas-casinos-legislature-defeat/ One of the Park Board Trustees promotes his employment in the casino industry and an entity he apparently controls purchased the Pearl Inn across from Porretto Beach, as well as a small lot on the beach side neighboring parts of Porretto Beach. The purchase appears to be financed by an entity controlled by the former Mayor of Galveston's son.

commodity in the world. Sand is used in nearly every facet of daily life and is big business. Sand is becoming scarcer every year. Porretto Beach has inherent value given the substantial accretion of sand over the years and because its title tracks back to the Menard Act, which predates the State of Texas and provides the owner greater land and mineral rights than property transferred from the State of Texas.

The Defendants' actions have damaged Porretto Beach, and the claims are unrefutably ripe, especially now that Ms. Porretto has been prevented from using the parking area of Porretto Beach every time there is inclement weather since May 2021. Moreover, since the filing of this suit, the Defendants now seek approval to complete the rest of the Stewart Beach drainage project, which will damage Porretto Beach and neighboring properties by posting a Finding of No Significant Impact ("FONSI") and Environmental Assessment ("EA") on October 7, 2021. The FONSI and EA are documents required under the National Environmental Policy Act ("NEPA"). Ms. Porretto submitted an objection under the NEPA rules.

After the Trustee terminated the Porretto Beach, LLC lease and the Trustee focused on the sale process which meant working with the City to get approvals the buyer wanted to close, the Stewart Beach drainage project was discussed at public meetings. The backup material provided to officials for those public meetings showed the Defendants knew the project would impact neighboring properties, including Porretto Beach, which everyone knew was subject to bankruptcy protection. During those discussions, the City and Park Board acknowledged past sand mining occurred contrary to their prior denials when Ms. Porretto raised concerns in the main bankruptcy case. On information and belief, improper sand mining has continued until as late as Spring 2021 on private properties along the East beach area, which impacts the accretion for Porretto Beach and creates false data which effects the property henceforth given regulations rely on such data.

## II.    THE BANKRUPTCY CAROUSEL

Ms. Porretto was forced to file Chapter 11 Bankruptcy due to the litigation with the Defendants and Defendants' efforts to cloud the title of Porretto Beach, preventing her from selling the property. Additionally, the Defendants took steps before and after the bankruptcy filing to interfere and disrupt the Estate's use, control, maintenance, and sale of Porretto Beach.  Ms. Porretto's Chapter 11 case had all of the elements needed for a successful reorganization but was converted to Chapter 7 over Ms. Porretto's objection.

Post-conversion, Ms. Porretto worked with the Trustee to try to preserve Porretto Beach which was the Estate's largest asset.  Ms. Porretto provided extensive assistance in the litigation and maintained the property via a lease between the Trustee and Porretto Beach LLC.  With the Estate aided by all of her hard work,[5]  the Supreme Court ruled in favor of the Estate's rights to the property, and the Galveston District Court entered a final judgment on remand on April 9, 2015.  The legal decisions, including conceding any arguments during the appeal and final judgment process, were made by the Trustee or his counsel, not Ms. Porretto.

On October 13, 2015, the Trustee sent a notice of termination of the lease of Porretto Beach to Ms. Porretto. *See,* Doc. No. 541, p. 6.  After that, Ms. Porretto had less visibility regarding the property issues but continued to assist when possible.

Even after conversion to Chapter 7, the Defendants brazenly continued to damage the property and take actions in violation of the automatic stay, including mining sand and damaging Porretto Beach. The mining and damage to the property in 2013, 2015 and 2017 is documented by photographic evidence.

---

[5] There was no motion in the bankruptcy court to allow for a final jurisdictional determination and the Trustee asserts he was not giving approval for a final determination. Ms. Porretto and counsel have been in discussions with the USACE to see if the regulatory action can be voided, but the fact remains that the Defendants caused standing water on the property which damaged the property.  Purportedly, the application for the jurisdictional determination was submitted by the proposed buyer's architect.

On June 25, 2020, after the Trustee was unable to close on either of the two low offers he received for the property after several years of trying to close, the property was abandoned to Ms. Porretto. The closing on the second offer dragged out after the City of Galveston ("City") alleged it had a vested interest in rights of way on Porretto Beach. This new "land grab" in 2017 conflicted with the City's prior ratification that it had no property interests related to Porretto Beach. It is undisputed that the City did not maintain the alleged right of ways and still do not maintain the alleged right of ways. The City's actions were another effort in a long saga of the Defendants trying to cloud the property's title, devalue it, and create negative publicity for Porretto Beach, creating a spectacle with multiple public meetings despite a pending bankruptcy and the automatic stay being in effect.

After the abandonment, as soon as Ms. Porretto worked to restore the beach from 6th to 10th Street in order to open it to beachgoers, she was bombarded with the same pattern of conduct from the Defendants that she dealt with before and during the Bankruptcy. It was only in Spring 2021, that Ms. Porretto learned that the damage the Park Board caused in 2017 which created pooling water on Porretto Beach resulted in a wetlands jurisdictional determination further devaluing the property. This was while the property was under the control of the Trustee and subject to bankruptcy administration.[6]  There was no motion in the main Bankruptcy Case allowing for a final determination and the automatic stay was never lifted to allow for wetlands determination.

---

[6] The Estate's Special Counsel, Stephen Schulz, without disclosure in the bankruptcy court was at the center of both the wetlands and abandonment issues. He was not retained by the Estate to handle the sale issues and there was no disclosure he was representing the buyer. The buyer or its affiliates had wetlands and abandonment issues with other property that it owned which abutted Porretto Beach.  It appears that the Park Board's 2017 damage causing water to pool on the property leading to a wetlands determination and the City's "land grab" claiming rights to streets and right of ways were being exploited by the potential Buyer in an effort to use Porretto Beach to address issues on other property owned by the Buyer or its affiliates which was adjacent to Porretto Beach. The Trustee asserts he signed a letter prepared by the buyer's architect to allow the USACE to access the property, but did not agree to a final wetlands jurisdictional determination.

Over a decade after Ms. Porretto filed Bankruptcy, Porretto Beach was abandoned back to Ms. Porretto. Every day Ms. Porretto is learning new information which was never disclosed to her during the Bankruptcy related to the damage to the property and connections of the various people involved. This damage occurred despite the fact that the property should have been protected from the Defendants' actions given the automatic stay.

### III. REQUESTED RELIEF

Ms. Porretto files this Third Amended Complaint seeking to:

i)   stop the Galveston Park Board of Trustees ("Park Board"), the City of Galveston ("City"), and Texas General Land Office ("GLO") from continuing to interfere with Ms. Porretto's right to use, enjoy, and alienate the Porretto Beach Property by regulatory action as well as unauthorized actions on the property by the Defendants;

ii)   stop the retaliatory actions and disparate treatment Ms. Porretto is subjected to by the Defendants;

iii)   seek a declaratory judgment that the City of Galveston has no right or any right has been abandoned to alleged right of ways, city streets, and/or alleys that it asserts run through Porretto Beach;

iv)   compensate Ms. Porretto for the damages the Defendants have caused related to the Porretto Beach Property, including devaluing the property, preventing growth of property, and compensating her the pro rata share of the funds the Defendants obtained using her property as part of their funding requests and/or other contracts which included funds derived from FEMA, United States Army Corps of Engineers State of Texas General Land Office, or any other entity from December 20, 2011 to present (post-petition period); and,

v)   compensate her for the damage caused to Porretto Beach by the Defendants and/or those working in concert with the Defendants as their agents whether such damage is from takings clause claims such as false erosion ratings, flooding, scraping the land, moving sand, stealing sand, and damage caused from renourishment projects where large pipes were put on the property creating topographical changes leading to retention of water, etc.

## IV.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Complaint under 28 U.S.C. § 1334 as it arises from or relates to the main bankruptcy case.

2.      This is a core proceeding, in part, under 28 U.S.C. § 157 and raises issues related to the bankruptcy case, including Takings Clause Claims under the Fifth Amendment of the United States Constitution, Due Process Clause of the 14th Amendment, Article I, § 17 of the Texas State Constitution, Federal regulatory and statutory provisions governing coastal land and waters including but not limited to the National Environmental Policy Act 42 U.S. Code § 4321 *et seq.,* Clean Water Act 33 U.S.C. §1251 *et seq.,* Coastal Barrier Resources Act 16 U.S.C. §§3501-3510, 28 U.S.C. § 1331 (civil action arising under laws of the United States); 28 U.S.C. §§ 2201 et seq. (Declaratory Judgment Act);   and, Tex. Water Code § 11.086 *et seq.* This Court also has jurisdiction pursuant to the United States Supreme Court decision in *Knick v. Township of Scott* (2019) 139 S. Ct. 2162, 2167 and *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063 (2021).

3.      Under Rule 7008 of the Federal Rules of Bankruptcy Procedure and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, Ms. Porretto consents to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.      The State has waived sovereign immunity for Plaintiff's claims under Article I §17 of the Texas Constitution.

## V.      PARTIES

5.        Plaintiff is the Debtor in this case, Sonya Porretto, the owner of property described in the Abandonment Order in Case No. 09-35324, Doc. No. 748 also commonly referred to as the beach property from 6th to 10th Street, 11th to 12th Street, 14th to 16th, 19th to 21st and 26th to 27th (collectively, "Porretto Beach ").

6.        Defendant THE CITY OF GALVESTON PARK BOARD OF TRUSTEES ("Park Board") is an entity formed by statute that may be served with process through its Executive Director, Kelly De Schaun, at 601 Tremont, Galveston, TX, 77550 or wherever said officer might be found.

7.        Defendant THE CITY OF GALVESTON, TEXAS, is a government entity that may be served with process through its Mayor Craig Brown, Clerk, City Secretary or Treasurer at 823 Rosenberg Suite 201 Galveston, TX 77550, or wherever said officers may be found.

8.        Defendant GEORGE P. BUSH IS THE COMMISSIONER OF THE TEXAS GENERAL LAND OFFICE and is a natural person who may be served with process at his place of employment at 1700 N. Congress Avenue, Suite 935 Austin, TX 78701, or wherever else he may be found.

9.        Defendant TEXAS GENERAL LAND OFFICE ("GLO") is an agency of the State of Texas and can be served by serving its Commissioner, George P. Bush at 1700 N. Congress Avenue, Suite 935 Austin, TX 78701.

## VI.      HISTORY OF PORRETTO BEACH



Lounging on the beach is a Galvestonian tradition

10.      Porretto Beach is generally identified as the beach along the seawall from  6th-10th (sometimes referred to as "Porretto Beach Classic), 11th to 12th, 14th to 16th, 19th to 21st, and 26th to 27th.  Porretto Beach Classic is located between Stewart Beach and the 10th Street Groin. A review of 25 aerial photos over 66 years from 1954 to 2020 shows that Porretto Beach has grown

from approximately a width of 220 feet in 1954 to a width of about 560 feet win 2020 – a 250% increase in width. Since the Park Board was removed from daily shore maintenance by order of the Bankruptcy Court, Porretto Beach Classic has doubled in size from an estimated 9 acres to 18 acres.

11.      Sand flows to Porretto Beach from East to West which is called sand littoral drift. The Park Board has been raping sand from the East end beaches in Galveston, including from Stewart Beach and other private lands, as recent as early 2021.

12.      Porretto Beach is historically significant in the Galveston community and environment and was recently featured by the State in its Texas Highways magazine. *See*, https://texashighways.com/things-to-do/on-the-water/coast/galveston-resilient-spirit-sparks-another-renaissance/.   For decades, Porretto Beach's iconic multicolor umbrellas and chairs have decorated the beach and are routinely featured in tourists' photos.  Porretto Beach is quintessential Galveston.

13.      The Porretto Beach land also has historical significance reflective of Texas' unique history following the declaration of independence from Mexico. The Republic of Texas won its independence in 1836, which vested it with more than 216 million acres of public lands. *See* Thomas Lloyd Miller, *The Public Lands of Texas: 1519-1970* 25 (1971).  Galveston Island's public lands passed into private hands mainly through two large grants, the Menard grant and the Jones and Hall patent, and numerous smaller transfers of 10- to 40-acre lots.

14.      In 1836, the Republic of Texas agreed to sell over 4,600 acres of land to Michel B. Menard, which included the land known today as Porretto Beach.[7] Through the legislative enactment of the Menard Act signed by President Sam Houston in 1838, the Republic of Texas

---

[7] *See, City of Galveston v. Menard*, 23 Tex. 349, 400 (1859).

"relinquished all rights and claims" to Porretto Beach granting an uncommon full land grant. In the sale to Menard, the Congress intended and consented that submerged lands should pass by the sales and patents." See, *U.S. vs. 772.4 Acres of Land in City of Galveston*, Tex. 57 F. Supp. 462 (S.D. Tex. 1944).   Henry Porretto, Sr. acquired part of Porretto Beach at an auction held by the Galveston Independent School District.  Today, Ms. Porretto is the owner and a fourth generation of Porretto family members are working at the beach.

15.     Porretto Beach, which runs along Galveston's coastline, is one of the rare sections of the Texas coastline that is privately owned and operated as a private beach. Ms. Porretto's grandfather and father preceded her as owners of the property.

16.     Ms. Porretto's family have been active and involved in the community for decades and contemporaries of other landowners such as Johnny Mitchell and George Mitchell. Ms. Porretto's father, Herny Porretto, Jr., had degrees in geology and petroleum engineering from The University of Texas.  Ms. Porretto's father even built and donated 20 lifeguard stations to use all along the Seawall beaches.

17.     Ms. Porretto took up the torch when her father passed and fought against the General Land Office's claim that the State owned Porretto Beach. The State's position in a nutshell  was "We own your beach because we say we do."  Then, after years of litigation, the State no longer claimed ownership and had no explanation for the change of course. The Estae retained counsel to continue the litigation post-bankruptcy and post-conversion to Chapter 7. Ultimately, the case went to the Texas Supreme Court. *See, Porretto v. Tex. Gen. Land Office,* 448 S.W.3d 393 (Tex. 2014).  At the time, the Supreme Court found that Ms. Porretto's takings claims were not ripe.

18.     Since then, the Defendants have taken actions resulting in: i) flooding Porretto Beach Classic's parking lot, ii) receiving funds from various sources using Porretto Beach without

authority as part of their requests without providing any benefit to Porretto Beach; iii) refused to honor the settlement agreement entered into with Ms. Porretto during the Bankruptcy which was approved by order of this Court; iv) damaged Porretto Beach including but not limited to actions taken in 2013, 205 and a 2017 renourishment project; v) continued efforts to assert control over the property without authority; vi) continued actions moving and/or removing sand from Porretto Beach; and, vii) currently seeks approval of a Stewart Beach Drainage Project which Defendants know is anticipated to further damage Porretto Beach and they are supporting with a Finding of No Significant Impact and draft Environmental Assessment required by NEPA which contains material omissions and misrepresentations.

19.     Below is graphic showing the Porretto Beach locations marked with red triangles:



20.    Below is a diagram of the Porretto Beach Classic area.



## VII.    FACTUAL BACKGROUND

21.    Ms. Porretto spent years focused on preserving and maintaining Porretto Beach. The Bankruptcy process was supposed to help provide a fresh start. She presented potential development deals during the life of the Bankruptcy, but nothing would be pursued if she remained involved in any deal post-closing.  Now, after the property being abandoned, the Defendants are trying to shield themselves from any of the wrongs they did during the Bankruptcy which impacted the property today and went so far as to deliberately flood the section of Porretto Beach which is most used and valuable for helping generate revenue to preserve the beach – the parking area.

22.     As soon as Ms. Porretto attempted to open Porretto Beach Classic to beachgoers she was hit with retaliation and interference by the Defendants disrupting her use, enjoyment, and alienation of the Porretto Beach Property.[8]

23.     The damages the Defendants have caused to the Porretto Beach Property are ripe especially given the flooding of the property which the Defendants knew was a substantial risk if any work was done on the Stewart Beach drainage project not just because citizens spoke up at public meetings but because the Defendants' own records and studies anticipated damage to the adjacent property owners. Those studies and reports occurred before Porretto Beach was abandoned to Ms. Porretto.

**Stewart Beach Drainage Project Floods Porretto Beach**

*Ms. Porretto's Cease and Desist Letter and City Attorney's Response*

24.     On April 16, 2021, Ms. Porretto personally served the City and Park Board with a Demand to Cease, Desist and Objection ("Cease and Desist Letter"). The Cease and Desist Letter included an objection to the Stewart Beach Drainage Project and the 2021 Seawall Beach Renourishment Project. Accordingly, the allegations set forth in the Cease and Desist Letter are incorporated herein by reference.

25.      On April 28, 2021, the City Attorney responded to Ms. Porretto's Cease and Desist Letter with numerous non-sequiturs, gaslighting, and patronizing misrepresentations like when he questioned Ms. Porretto's objection to the Stewart Beach Drainage Project stating "Quite to the contrary, Stewart Beach is approximately ½ mile to the east of your property. Can you please state

---

[8] Ms. Porretto submitted a cease and desist to the City and received a nonsensical response from the City Attorney suggesting Porretto Beach was a half mile away from Stewart Beach. *See*, **Exhibit 1.** The Chapter 7 Trustee was also met with acts of resistance from the Defendants, particularly the Park Board, which attempted to assert control over the property in violation of the automatic stay. *See e.g.*, **Exhibit 2** (communications between Trustee and Park Board counsel).  In addition, a resident who also served on the City of Galveston City Council raised concerns with excavating sand from the beachfront going back as far as 2003. *See,* **Exhibit 3.**

with clarity your objection to a project that will take place nearly ½ mile away from your property?" The City Attorney's lack of knowledge of Porretto Beach's location and the fact that it is adjacent to Stewart Beach is disconcerting at best.

*Work at Stewart Beach Commences Over Disregarding Objections of Citizens*

26.     In May 2021, the Park Board began work on the Stewart Park Drainage Project. In public meetings, the Park Board and City discussed they could argue the right to move sand under prior permits to the Stewart Beach parking area before getting full approval to start work on the Stewart Beach Drainage Project.

27.     On February 24, 2017, Francisco C. Guerrero, P.E. on behalf of Atkins, issued the "Galveston Island Stewart Beach and East Beach Drainage Report" for the Galveston Island Park Board of Trustees ("2017 Atkins Report"), and on Page 1 of the report stated:

> The parking at both Stewart and East Beach Parks experience flooding even during light storm events. Daily use, driving and parking, and harvesting sand at these two parks have compacted and removed enough sand to create low areas that easily become saturated and can result in flooding and ponding water (see Exhibits 2 and 3). The parking area surface is also at a lower elevation than the adjacent beach, thereby creating a bowl like condition. At Stewart Beach, maintenance crews have had to constantly manage this flooding condition by cutting trenches between the vegetated seaweed berms facing the Gulf of Mexico (Gulf) in order to drain the parking lot.

28.    The 2017 Atkins Report includes a chart showing that Porretto Beach and other beaches surrounding the Stewart Beach parking area are at a higher elevation:



29.     Below are a series of pictures showing the construction and damage caused in

May 2021.

May 13, 2021 - Taken from Porretto Beach 6th facing Stewart Beach removing Seaweed and sand stockpiles from beachfront and placed on Stewart Beach parking lot to fill in flooding. Water trenches/ditches and swales created slanting the elevation of Stewart towards the west to Porretto Beach



May 20, 2021 - Taken of Stewart Beach from Grand Preserve, all the drainage diverted to Porretto Beach and Grand Preserve.





Emergency work by Porretto due to Stewart Beach drainage flooding Porretto Beach Parking lot and properties. Photo taken atop front end loader at Porretto Beach Parking lot at 7th Street facing Stewart Beach west side parking lot where Stewart Beach flooding was redirected to Porretto Beach. Here waters rushed from Stewart to Porretto flooding properties. An emergency damn was built on Porretto Beach east side adjacent Stewart Beach and City/Miller/TSB lots by dragging sand from Porretto Beachfront to the area along the back lot creating a wall to help keep water out and eroding the land.



May 20, 2021 - picture from east of Stewart Beach facing west to Porretto Beach where you can see water flowing from the Stewart Beach parking lot where the drainage is diverted to flood Porretto Beach.



May 20, 2021

This picture shows drainage redirected to East of Stewart towards Grand Preserve.



See drainage Directed to Porretto Beach Flooding the area

June 25, 2021 - Taken from 10th Street entrance ramp onto the parking lot - facing east to Stewart



June 27, 2021 - Taken from Seawall facing south, flooding persists



Appearance of water flooded lot visible front the Seawall deterring customers from parking on-site and impacts Porretto Beach revenues.

While Park Board places new sign at Porretto Beach entry to divert customers to the park board maintained beaches aware they caused damage…..

August 5, 2021 - Taken from entrance ramp facing east



August 27, 2021 - Facing east towards Stewart, taken from foundation

Porretto Beach with flooding lot, water coming from the east (Stewart Beach), lowered elevation is visible with slant towards the north



Drainage eventually reaches 10th street in millions of gallons of quantity gouging the once highly elevated surface into a river due to erosion from Stewart Beach parking drainage flooding into Porretto Beach at 6th all the way to 10th where eventually the waters make its way to the Gulf by force digging into the surface along the way



Continued damage From parking lot flooding to Porretto Beachfront.

All of which could have been prevented but City and Park Board ignored citizen pleas not to proceed because it would cause damage.

View at Porretto Beachfront 10th facing east towards Stewart Beach.



30.     The following diagram provides a visual of the water flow from Stewart Beach to Porretto Beach:



**Sand Mining and False Erosion Data**

31.     During the Bankruptcy and even after the property was abandoned, the Park Board was excavating sand from Porretto Beach. Other beachfront property owners also rasied concerns regarding the theft of sand from their beaches.

32.     These actions have caused false erosion data for years. In 2013, Ms. Porretto called 911 to report theft of sand to no avail.  The Park Board has its own Park Board police where calls to the Galveston Police Department regarding beaches are referred to the Park Board police.

33.     During the Bankruptcy, the Park Board was leasing Porretto Beach to concessionaires without authority in violation of the automatic stay.  The Park Board recently sought applications for concessionaires and referenced Porretto Beach property in the public notices as if it had the authority to lease Porretto Beach.

34.     In 2012, the Park Board also resumed excavating the shoreline of Porretto Beach including the area along the shore also known as the "wet beach," where the measurements are taken for erosion studies.  In addition, the Park Board applied and obtained local, State and Federal permits based on material omissions or misrepresentations. Porretto Beach was included in the permits by mispresenting the ownership of the property. The Park Board did so without authority, bankruptcy approval, and in violation of the automatic stay.

35.     From at least March 10 to March 30, 2013, the Park Board continued to excavate the shore of Porretto Beach using three to four front-end loaders to excavate and steal sand from the seawall to shoreline on Porretto Beach 26th to 27th over at least five full days.  The sand was stockpiled on East Beach, a public beach at the far East End of the Island.  The Park Board then commenced an Erosion Response Project a/k/a Seawall Beautification Project after manufacturing a false erosion baseline to get funds for the sand it took to East Beach. The 2013 project was funded by the non-profit Artist Boat, GLO and others.

36.     On information and belief, the Park Board was also leasing Porretto Beach 26th to 27th to Jason Worthen without bankruptcy court authority (a current Park Board Trustee on the Park Board).

37.     From March 2015 to May 2015, the Park Board was occupying Porretto Beach without authority.

38.     In 2017, the Defendants used Porretto Beach while engaging in a renourishment project causing significant damage, improper moving of sand, and sand mining.

39.     A review of the Park Board's and City's minutes and videos tell a disturbing story acknowledging the damage to Stewart Beach was caused by the Park Board's management and "messing with mother nature." By extension, the damage to neighboring properties was caused by the Park Board's management.  It is important to recognize that there is substantial cross-over

between those who have served on the Park Board and those who served on City Council. For example, the current Mayor of Galveston was a member of the Park Board for years. Another Councilmember works summers for the Park Board.  The Council also has a liaison that serves on the Park Board. The City appoints the Park Board members.

40.     The Park Board stated that in retrospect maybe it should have sued the contractor who scraped the beaches. Of course, the Park Board did not admit to all the scraping or that it was continuing to mine sand, but the Park Board started acknowledging the self-evident truths about its sand mining of Stewart Beach.

41.     The Park Board's and City's acknowledgment of sandminding is tantamount to acknowledging the creation of false erosion data which becomes the baseline for permitting, development approvals and other decisions related to real property thereby destroying any semblance of due process because it shows the government unilaterally manipulates the data to obtain funding to the deteriment of private property owners whose applications for permits or developments are reviewed based on false data.

42.     More alarmingly, if the erosion data is false or manufactured, it could be relied upon by others jeopardizing the safety of everyone in Galveston and the surrounding area who are susceptible to flooding by skewing decisions on the best remedial projects to help reduce flooding, *e.g.,* the Ike Dike Project.

43.     There is a question as to whether the Park Board Trustees have been properly qualified as Trustees and/or whether their acts would be ultra vires, void, or voidable. Discovery would be necessary to resolve this question, but nothing has been located in publicly accessible records showing the Trustees meet the qualification requirements.

44.     The City of Galveston approved the Park Board's request for a permit to allow the beachfront construction of the Stewart Beach Drainage Project over citizens' objections with the

City knowing the Park Board has not been a good steward of the Stewart Beach and was at fault for creating the drainage problems.  At a public meeting, the Park Board discussions showed that they knew elevating Stewart Beach would require specific engineering to ensure that surface water did not flow to Porretto Beach. Yet, they commenced work in May 2021 without doing anything to protect adjoining landowners, including Porretto Beach.

45.     The flooding has caused Porretto Beach to lose substantial revenue and caused it to incur costs to mitigate damages just months after Ms. Porretto was able to reopen since the Trustee abandoned the property.  The damages include labor costs, opportunity costs, equipment rental costs to pump the water to the Gulf, and repair costs. In addition, the flooding has and will further impact the topography of Porretto Beach if not remedied.

46.     Ms. Porretto is also limited in the ways she can mitigate the flood damage from Stewart Beach. While Porretto Beach has sand in other parts of the beach which could be moved to mitigate the flooding in the Porretto Beach parking lot area, a permit would be required to relocate the sand to the parking lot.  The requirement of a permit is problematic because the Defendants adopted false reports with manufactured data. Over the years, they have asserted in various documents that Porretto Beach and other coastal properties were eroding when they were accreting.  The false reports and data are then relied upon in the permitting process. This creates a catch-22 for Ms. Porretto. The permit process allows the Defendants to essentially control and indirectly possess the property through the systemically flawed data caused by the Park Board's unauthorized sand mining and excavations. All Defendants were on notice of the concerns raised by Ms. Porretto, as they were raised during the Bankruptcy where all Defendants were active parties.

47.     If Ms. Porretto applies for a permit knowing that the Defendants used false data and records, she becomes complicit in the scheme to mislead others that certain Galveston beach

26

property is naturally eroding when, in fact, there is and should be natural accretion East end beaches.

48.     Several records used by the Defendants over the years allege Porretto Beach is eroding and refers to all properties from 10th to 61st Street as eroding which would include substantial parts of Porrett Beach.

49.     The false statements that Porretto Beach was eroding are an improper continued taking of the property rights related to Porretto Beach without consent of the property owner.

**The Park Board Competes with Porretto Beach for Parking User Fees and Concessions Rental**

50.     Porretto Beach has offered parking on site for many years. The Park Board, in particular, Stewart Beach has fought to charge user fees for parking at the public beaches. The Park Board charges a $15 user fee/parking fee to everyone who parks at public beaches. The user fee/parking fee at Porretto Beach is $10 with "in and out" parking privileges (when the parking lot is not flooded) and free parking for Galveston residents.

**The Sandmining of Private Property and False Erosion Data Appears to be Designed to Acquire Alternative Revenue Funds for the Park Board while the City was Aware of Concerns with Park Board Finacial Management But Remained Silent**

51.     The Park Board manages the public beaches in Galveston. On information and belief, the Stewart Beach Drainage Project was required to bring the Park Board into compliance and ensure it could qualify for Federal and State beach renourishment and grant funds and so that parking user fee revenue could be enhanced by preventing flooding in Stewar Beach's parking lot. Notably, the Park Board collects user fees in cash and has resisted going to other electronic forms of payment which have better checks and balances.

52.     Further, on information and belief, after the City was advised of potential financial improprieties by the Park Board related to renourishment funds. Reportedly, the City Manager had

City Staff conducted an audit of the Park Board and were aware of improprieties. Reportedly, an audit of the Park Board financials was prepared by City Staff which was reviewed by the City Manager and buried from the sunlight.  Given other records publicly available regarding a review of the Port, there could be a semantic quibble over whether there was an "audit" or just a review of the finanical records.

53.     The Galveston City Council appoints the Board Members to the Park Board. The City is limited by City Charter on expenditures where anything over $15,000 requires a vote of Council. Conversely, the City Council and Park Board have taken the position that the Park Board is not subject to those Charter limitations and allows the Park Board a much greater spending authority wihtout the need to seek approval.

54.     The City of Galveston appears to have lacked any proper oversight over the Park Board or the taxpayer dollars that go to the Park Board and allowed it to destroy beaches and mess with "Mother Nature" which directly impacts the value and use of Porretto Beach.

**Impact of Sand Mining in More Detail**

55.     The Park Board removes sand to decrease beachfront elevations.[9] Then, the decreased elevations are measured to support a finding that there is erosion. Once the measurements show erosion, the Park Board qualifies for millions and millions of Federal and

---

[9] The Park Board's scraping of the sand at the waterline has significant ramifications for all coastal property.  Coastal area management is subject to 31 Tex. Admin Code Sec. 15.3(s)(4)(D)(i) which requires the use of the University of Texas at Austin, Bureau of Economic Geology ("UTBEG") Shoreline Movement and Beach-Foredune Elevations and Volume, *i.e.*, UTBEG Shoreline Study.  The UTBEG Shoreline Study relies on taking a Lidar Test to measure elevation. The Lidar Test is taken at a specific location and is used to determine accretion and erosion rates. On information and belief, the Lidar tests for the UTBEG Shoreline Study were taken at the areas of the shoreline where the Park Board excavated the shoreline creating artificially lower elevation which are then captured in the Lidar Test and incorporated in the UTBEG Shoreline Study. On information and belief, UTBEG was not informed of the sand removal. On information and belief, the Park Board, City and GLO were aware of the Park Board's excavations and the inherent inaccuracies with the Lidar Test which would show arbitrarily low elevations due to the excavation even if a property was accreting.  The UTBEG Shoreline Study is the basis for various State and Federal actions and funding for coastal property, including but not limited to the permitting and use of the property.

State tax dollars for beach renourishment and grant funds -- year after year, decade after decade. The Defendants have qualified for at least $20 million in funding for Galveston Beaches using Porretto Beach since this bankrutpcy case was converted to Chapter 7. Discovery will be needed to determine if the GLO knew the measurements have been manufactured by scraping the land and acted in concert, was complicit and/or was kept in the dark.

56.     On information and belief, the GLO and City have improperly had Porretto Beach surveyed without Ms. Porretto's permission contrary to law, including potentially after this case was filed. Conversely, the Park Board refused to allow Ms. Porretto have a surveyor assess Stewart Beach given the concerns that the Park Board would alter the topography after this Complaint was filed to distort the elevations. Since the filing of the case, a front-end loader was sighted on the wet beach of Stewart Beach. There is no good reason for a front-end loader to be on the wet beach.

57.     Prior Park Board meetings show that the City knew or should have known of the grave consequences caused by the Park Board's actions and acted in concert with the Park Board by not requiring the sand be replaced and sand stolen from private property owners like Ms. Porretto returned. Arguably, the City should have fully investigated the sand scraping concerns Ms. Porretto raised and made sure BEG was put on notice of the scraping issues before it took Lidar readings.

58.     Through the Bankruptcy, Ms. Porretto was able to get the Park Board to stop using their excavators and/or front-end loaders on the Porretto Beach property for a time. A Settlement Agreement was entered into between Ms. Porretto and the Park Board in the main Bankruptcy (Doc. No. 195) which dealt with the issue.  As noted above, after the Park Board stopped "maintaining" the shoreline for Porretto Beach. As a result, Porretto Beach's dry beach grew significantly from the accretion. Despite the automatic stay and agreements in the Bankruptcy, the

Park Board continued to damage the Porretto Beach property over the years including but not limited to 2013, 2015 and 2017.

59. The long-term effect of the Park Board's sand removal from Porretto Beach has not been remedied and is far-reaching.

60. The Park Board's removal of the sand reduced the growth of the dry beach, which reduced the property value.

61. In addition, sand can be sold and monetized if a private owner has too much sand and knows how to properly manage a beach.

62. There are a number of historic records before the Park Board adopted this "alternative revenue game" of soliciting renourishment dollars showing that the East beaches are accreting beaches. Suddenly, beaches that were always known to be accreting were being identified as eroding beaches.

63. Further, the damage caused by removing sand creates the need for projects like the Stewart Beach Drainage Project to mitigate the damage caused over time by the Park Board removing sand. The Park Board is sabotaging the beaches and destroying their natural value.

64. Ms. Porretto has documented the growth of Porretto Beach since the Park Board was banned from scraping the shore every day by the 2010 Order of this Court. In ten years, the property has grown substantially.

65. At one time, the Park Board alleged it was only maintaining the beaches and any sand it removed as they cleaned up seaweed was minimal. However, numerous videos and pictures showing front loaders/excavators full of sand on Porretto Beach not to mention public comments during a Park Board meeting. Furthermore, the Park Board ultimately was required by the USACE to change the equipment used to maintain the beachfront and started using the Barber Surf Rake. The Barber Surf Rake was what Ms. Porretto used for Porretto Beach. As such, Ms. Porretto's

ingenuity has benefitted all the public beaches to promote the Park Board using rakes instead of excavators.

66.     The allegations that the Park Board was removing sand are serious. The fact that the City acted with the Park Board is even more serious. The actions were in concert and designed to hide the full story from this Court, as well as the public. The GLO knew of these issues since they were raised in the Bankruptcy or should have known. The leases with the Park Board and City should have been terminated given the mismanagement which would have helped protect Porretto Beach and other property.

67.     If private property like Porretto Beach shows significant accretion, it makes it less plausible that the adjacent Park Board-managed public beaches are naturally eroding. Therefore, Porretto Beach because the subject of attack, harassment and ridicule.

68.     Ms. Porretto seeks to have Porretto Beach correctly reflected in the coastal management documents maintained and used by all Defendants showing it is accreting and not eroding; recognize her property rights to the property identified in her deeds and chain of title, including having boundaries determined for what submerged lands are alleged to be State owned and a determination that she has mineral rights to all property where she is the titled owner; stop the flooding from Stewart Beach; compensate Ms. Porretto for the Park Board's breach of the settlement agreement; and, compensate Ms. Porretto for the continuing damage and takings the Defendants are causing to Porretto Beach.

**Raw Sewage Discharge**

69.     Since the filing of this suit, Porretto was informed that there could be a problem with raw sewage leaks from City pipes. TCEQ reports show a history of issues and reports sewage leaks. If raw sewage has been pumped into the Bay by the City, then it impacts the health, safety

and welfare of everyone in the area and the property adjacent to the water, especially an operating beach where users will be concerned with danger warnings about the condition of the water.

**Value of Porretto Beach**

70.     The Porretto Beach property was appraised in 2008 and valued at close to $10 million. It is worth far more today. The beach at 6th to 10th Street has doubled in size.  Sand is more valuable today as a commodity. The cloud on the title caused by the GLO's land grab was resolved by the 2015 Judgment. In addition, Pleasure Pier which, has become a top Galveston destination, was opened in 2012 and is adjacent to Porretto Beach 26th Street to 27th Sreet:



**Harrassment, Retaliation and Denial of Public Services**

71.     Not only has Porretto Beach not received a fair share of funding when the property was included in funding requests, Ms. Porretto has had to deal with the games the Park Board and City plays to harass, retaliate, and interfere with her operations of the beach.

72.     The Park Board's modus operandi for the harassment and retaliation appears to be the "million paper cut" approach so that it seems like the aggrieved party exaggerates the concerns.

73.     The City emails show that starting by at least in March 2021 that Ms. Porretto and Porretto Beach were being watched closely with one email even suggesting surveillance.  This coincides with the time that Ms. Porretto was working to restore 6th to 10th Street near Stewart Beach to reopen and operate the beach for the first time in years.

74.     City Marshals were watching the property.

75.     The Mayor was hounding City Staff to take action regarding food trucks at Porretto Beach but seemingly unconcerned about food trucks at other locations in the City.

76.     The Park Board sent a threatening letter to Ms. Porretto's son because trash was picked up, bagged, and put near the Park Board's trash cans.  Despite the Park Board's duty to pick up trash, it claimed such efforts by others for the benefit of the Park Board which failed to do its job was "littering." (hereinafter "Litter Letter).

77.     The Litter Letter demonstrates the petty level of harassment the Park Board is willing to engage in. The Litter Letter is non-sensical and inappropriate on several levels.  It failed to acknowledge the Park Board was responsible for the trash pick-up on Porretto Beach under a Court-approved settlement signed by the very same attorney who sent the Litter Letter. *See,* Doc. No. 195.

78.    The key terms of the settlement are as follows:

## ARTICLE 3.

### BEACH PATROL

3.1    The Park Board agrees to perform lifeguarding services through the Galveston Island Beach Patrol on PBDRA in the same manner as it performs lifeguarding services through the Galveston Island Beach Patrol for the other beaches on which it performs such services. In that regards, the Galveston Island Beach Patrol will maintain one guard tower at the 10th street pier during peak season.    In addition, depending on the need and time of the year, the Galveston Island Beach Patrol will maintain an additional guard tower.

## ARTICLE 4.

### TRASH PICKUP

4.1    The Park Board agrees to perform trash pickup on Porretto Beach in the same manner as it performs trash pick up on Stewart Beach, including daily pick up during the summer season.    The Park Board will provide sixteen (16) trash cans positioned at the front of the crossties/bollards and continue the use of hand pickers from the shoreline to the crossties/bollards using the same scheduling as used at Stewart Beach.

## ARTICLE 5.

*Id.* (emphasis added).

79.  Second, the Litter Letter was sent to Mr. Nelson not Ms. Porretto, the owner of the property. As such, it appears the letter is a personal threat that individuals helping Ms. Porretto with operations could get dragged into legal actions.

80.  The Litter Letter alleges "Like any other private entity or person, Porretto is responsible for disposing of its own trash." This statement is simply not true.

81.  Trash collection is a core service offered by most municipalities in the Greater Houston-Galveston area.  Galveston has a Public Works Department - Sanitation Division. Residents pay for trash service via their water bill. Galveston residents do not have to contract with a private trash company or buy stickers per bag for the trash to be picked up.

82. However, Galveston has denied Ms. Porretto a water hook up and trash collection services despite providing such services to other businesses. As to the water hookup, the City claimed it did not know where the water was on the beach side. Those representations are contradicted by the Stewart Beach Drainage Project drawings and plans showing the location of the water line.

83. The Litter Letter escalated quickly from nonsensical to surreal stating:

This behavior is unacceptable, and you are—hereby—given notice that if Porretto does not immediately cease littering and/or dumping its trash onto public property, the Park Board will be forced to act, including notifying the police and/or the City of Galveston's Code Enforcement Division, seeking injunctive relief, and pursuing other remedies that might be available to it.

84. As further evidence of the harassment, Porretto Beach had a large sign advertising Porretto Beach for years. When the sign is damaged from time to time, it is repaired. As Ms. Porretto prepared to reopen Porretto Beach this Spring, she had the large Porretto Beach sign repaired. On June 1, 2021, the city sent a signage violation notice alleging the sign was now a prohibited sign. Ms. Porretto's repair of the sign was in compliance with the City Code which requires signs to be repaired. *See,* Section 5.303 of the Appendix A – Land Development Regulations to the City Code (hereafter, "5.303").[10]  The sign for Porretto Beach was originally placed by Jules Lauve sign company in 1980. Numerous repairs were made from the 1990's to 2008. After Hurricane Ike, the sign was repaired with the aid of sponsors Houston Land Rover and BMW a sonic corporation. In or around 2017, the sign issue was discussed in the Bankruptcy and

---

[10]

SEC. 5.303 - SIGN MAINTENANCE

   A.  All signs, together with all their supports, braces and anchors, shall be maintained in good condition and repair. Conditions noting neglect, deterioration or dilapidation of signs shall include but not be limited to:

      1.  Rust or holes on or in the sign or sign structure;

      2.  Missing sign copy or missing letters;

      3.  Cracked, broken, missing, loose or bent parts;

      4.  Faded, peeling, or chipped paint; and.

      5.  Non-operative or partially non-operative illuminating or mechanical devices.

   B.  Upon notification by the Development Services Department, signs that are neglected, deteriorated, or dilapidated shall be repaired, replaced, or removed within thirty (30) days.

( Ord. No. 18-037, § 2, 6-21-18 )

Ms. Porretto's understanding is that the issue was resolved. The violation notice sent on June 1, 2021, shows the continued harassment and efforts to try to interfere with Ms. Porretto's ability to advertise that Porretto Beach is open for business and negatively impacts revenue for Ms. Porretto.

85.     Other core services provided by municipalities are police and fire services.  Ms. Porretto does not get fair and equal protection for Porretto Beach. The City of Galveston Police did not act when reports were made by Ms. Porretto about the Park Board, including but not limited to reporting theft of sand.

86.     The Park Board deliberately flooded the property with construction at Stewart Beach.

87.     The City ran a fire hyrdrant during inclement weather where the flow drained down the Porretto Beach ramp contrary to fire code provisions.

88.     The City sent a shutoff notice to Ms. Porretto's elderly mother for an overstated water bill knowing Ms. Porretto lived at the same address.

89.     The Park Board without any notice - not even a quick email - did not pick up trash the weekend of August 7 – 9, 2021. This was trash in the Park Board's trash cans located on Porretto Beach. The Park Board picked up the trash from those cans since at least 2010 when the Court entered an order in this case dealing with the disputes between the Debtor and Park Board. The morning of August 9, 2021, Ms. Porretto removed all of the Park Board's cans from her property and placed them on Stewart Beach. Then, the cans were emptied.  Ms. Porretto is handling the trash removal going forward because the cleanliness of the beaches is directly tied to the health, safety, and welfare of those using the beaches. These are concerns that should be paramount to everyone working with the public even -- if it is not a concern for the Park Board.

90.      The Park Board later alleged it stopped picking up trash because there was a sign on Porretto Beach that said no vehicles allowed past this point. The same type of sign that has been

posted for decades on Porretto Beach and public beaches and was present just the days before when the trash was picked up. More notably, the cessation of the trash pick up was after Ms. Porretto's counsel raised concerns about the potential raw sewage leak on the morning of August 6, 2021.  On August 8, 2021, Porretto Beach was also getting a lot of positive attention on social media when a resident posted this picture in a Facebook group of thousands:



91.     Incredulously, in September long after this litigation was commenced, the City Councilmember who serves as the liaison to the Park Board went to Porretto Beach and verbally disparaged Porretto Beach making false allegations regarding the beach and cursing out Mr. Nelson who was setting up the beach.

**Abandonment of Porretto Beach by Chapter 7 Trustee**

92.     The Chapter 7 Trustee's abandonment of the Porretto Beach property was approved by the Bankruptcy Court on June 25, 2020, and reverted control of Porretto Beach to Ms. Porretto. *See,* Doc. No. 748.

93.     From that point forward, Ms. Porretto worked tirelessly to restore Porretto Beach to a semblance of its former glory targeting Spring Break 2021 for a big reopening. While Ms. Porretto was able to have limited operations in 2020 at Porretto Beach West, the section of Porretto

Beach adjacent to Stewart Beach, a public beach, opened for the first time since the abandonment in late March 2021.

The Abandonment Order provides for exclusive jurisdiction in the Bankruptcy Court:

> 6.    The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order or the Trustee's Abandonment of the Abandoned Property, and to adjudicate, if necessary, any and all disputes concerning or in any way relating to the Abandonment, ̶d̶o̶o̶d̶x̶d̶o̶g̶x̶d̶o̶d̶o̶d̶o̶x̶d̶x̶d̶o̶x̶d̶x̶d̶o̶d̶o̶x̶x̶x̶d̶o̶x̶d̶o̶g̶x̶d̶o̶x̶d̶x̶d̶o̶x̶d̶o̶x̶d̶x̶x̶d̶o̶x̶d̶o̶g̶x̶d̶o̶d̶

Doc. No. 748, p. 7.

94.    Upon abandonment, the ownership and control of the Porretto Beach property reverted to Ms. Porretto. Therefore, Ms. Porretto is the owner of the Porretto Beach Property and has standing to raise these claims.[11]

## VIII.   CAUSES OF ACTION

95.    Plaintiff alleges the following causes of action together and in the alternative and incorporates by reference the preceding paragraphs into each Count listed below.

**Count I: Taking of a Flowage Easement Without Just Compensation in Violation of the Fifth Amendment of the United States Constitution**

96.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

97.    Plaintiff alleges that the Defendants' taking of a flowage easement for flooding which occurred from May 13, 2021 until such date that the Park Board remediates the problem prevents Ms. Porretto from being able to fully use, enjoy, and occupy her land and property.

98.    The impoundment of rainwater runoff on Plaintiffs' property for days on end, destroying Ms. Porretto's real and personal property.

---

[11] To the extent any claim is deemed not to be abandoned by virtue of the abandonment of the real property, Ms. Porretto requests that the Chapter 7 Trustee substitute in for such claims and/or for the Court to provide Ms. Porretto authority to pursue the claims for the Estate.

99.     The flooding has caused damage to the real property including market value, potential wetlands issues, erosion, decreased accretion, and dimunition in value.

100.    The Defendants' actions in connection with Stewart Beach Drainage Project violated Plaintiff's protectable property rights. Specifically, Plaintiff owns real property impaired by the Defendants' taking of flowage easement.

101.    The damage is substantial.

102.    The Defendants' actions were a cause in fact and/or proximate cause of the taking. The storage and invasion of waters from Stewart Beach on Porretto Beach was both the intended and the direct, natural and probable result of the Stewart Beach Drainage Project.

103.    The Defendants have not paid just compensation to Ms. Porretto for the public use of her property.

## Count II: The Taking of Other Property Interests Without Just Compensation in Violation of the Fifth Amendment

104.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

105.    Defendant's actions ran counter to Plaintiff's reasonable investment-backed expectations in the safety and security decisions in operating the beachfront commercial property.

106.    Defendants have also surreptitiously and continuously taken sand or allowed sand to be removed from Porretto Beach without compensation to Ms. Porretto. By taking the sand, the Defendants also took away Ms. Porretto's right to have a proper elevation data record for the property showing the accretion and proper elevation for neighboring properties. All of which impacts the development opportunities and value of the property.

107.    Further, the sand mining and erosion from the flooding reduces the accretion and growth the beach.

108.    Defendants have taken away Ms. Porretto's property rights.

39

109.    The damage to Ms. Porretto protected property interests is severe. Plaintiff cannot fully use, enjoy, or occupy the Porretto Beach property during high season where the Park Board and local media are reporting high tourism numbers. The Defendants' actions were the cause-in-fact and proximate cause of the taking. The storage and invasion of stormwaters onto Plaintiff's real property was both the intentional and the direct, natural, and probable result of the Defendants' activity.

110.    As a result of the foregoing, and in addition to, or in the alternative to, the other causes of action asserted herein, Plaintiff has been deprived of the full use, occupancy, and enjoyment of her property (including the land, immovable improvements, and personal property), resulting in a taking of her property for a public use, without payment of just compensation.

**Count III: Inverse Condemnation**

111.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

112.    By surreptitiously entering the land owned by the Plaintiff, the Defendants failed to compensate the Plaintiff for using her land.  The Defendants intentionally have taken the land owned by the Plaintiff without due process and just compensation. The Defendants' wrongful actions constitute inverse condemnation at Texas common law.

113.    As a result of the foregoing, and in addition to, or in the alternative to, the other causes of action asserted herein, Plaintiff has been deprived of the full use, occupancy, and enjoyment of her property (including the land, immovable improvements, and personal property), without payment of just compensation.

**Count IV: Interference With Accretion Levels Without Just Compensation in Violation of the Fifth Amendment**

114.　Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

115.　The Stewart Beach Drainage Project construction interfered with the natural easterly littoral flow of sand that, before construction of the project and sandmining causing the need for the project, would have provided regular, natural replenishment of sand to the Porretto Beach properties.

116.　Porretto Beach pre-existed the use of Stewart Beach by the Defendants.

117.　It is well settled that flooding and attendant erosion of private property by the Government amounts to a taking. *United States v. Dickinson,* 331 U.S. 745, 750, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947) ("When it [the Government] takes property by flooding, it takes the land which it permanently floods as well as that which inevitably washes away as a result of that flooding."); *accord Owen v. United States,* 851 F.2d 1404, 1414 (Fed.Cir.1988). Such erosion amounts to a physical taking. *Owen,* 851 F.2d at 1409, 1413. Further, "the actual [Governmental] construction ... need not directly encroach upon the property in question before a taking by the government can be deemed to have occurred." *Id.* at 1411-12. "[I]t is not the location of the cause of the damage that is relevant, but the location and permanence of the effect of the government action causing damage that is the proper focus of the taking analysis." *Id.* at 1412 (emphasis omitted) (citing *Tri-State Materials Corp. v. United States,* 213 Ct.Cl. 1, 7, 550 F.2d 1, 4 (1977)).

118.　The actions of the Defendants have also caused erosion. Erosion of property due to government action is one example of physical injury that rises to the level of a taking. See, *e.g., Boling v. United States*, 220 F.3d 1365, 1373; *Applegate II,* 35 Fed. Cl. 406, 414.

**Count V: Violation of Article I, Section 17 of the Texas Constitution for the Taking, Damaging, or Destruction of their Property**

119.   Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

120.   To establish a claim under Article I, Section 17, a property owner must show that there has been: (1) an intentional government act by a government entity; (2) that resulted in the taking, damaging, or destroying of a property owner's property; and (3) for public use. Plaintiffs' claims fulfill each of these requirement.

121.   The design, construction, operation, and/or maintenance of Stewart Beach constitutes a "public use" for purposes of Plaintiffs' claims.

122.   The Texas Supreme Court has recognized that compensation for the taking, damaging or destruction of private property is in order if an injury results from either the construction of public works or their subsequent maintenance and operation.

123.   Defendants intentionally caused damage to Porretto Beach with the flooding, sand mining and false erosion data.

124.   The Defendants were substantially certain that Porretto Beach would be damaged by their actions.

**Count VI: Deprivation of Property Interests Without Procedural and Substantive Due Process in Violation of the Fourteenth Amendment to the United States Constitution.**

125.   Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

126.   In the alternative, Plaintiff assert that the Defendants' conduct violated her rights, privileges, and/or immunities secured by the U.S. Constitution, including but not limited to depriving Plaintiff of a property interest without due process of law as guaranteed by the Fifth and Fourteenth Amendments of the U.S. Constitution.

127.   Ms. Porretto does not have the opportunity to have her claims heard in a meaningful manner because the process provided under Texas and Federal law is not constitutionally adequate

to deal with inverse condemnation claims, false erosion data, and Defendants' manipulation of the land changing the whole beach topography impacting other private property.

128.    The failure to institute a pre-deprivation process before false data is collected, sand mining, or construction undertaken to flood property is because of the Defendants reckless disregard, willful ignorance, and/or intentional avoidance of knowledge and facts which was the proximate cause of damage to Ms. Porretto's property and liberty interests

**Count VII: Breach of Settlement Agreement**

129.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

130.    The Park Board has breached its settlement agreement with Ms. Porretto by failing to pick up trash and provide a lifeguard.

131.    The Park Board's failure to comply with the terms of the settlement constitutes a breach of contract at Texas common law.

132.    Ms. Porretto is entitled to damages for the Breach of the Settlement Agreement. In addition, or/or in the alternative, Ms. Porretto seeks specific performance. In addition and/or in the alternative, Ms. Porretto seeks nominal damages. Ms. Porretto is also entitled to her reasonable attorney's fees and costs due to the breach of the settlement agreement.

**Count VIII: Tortious Interference, Harassment and Retaliation**

133.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

134.    The Park Board and City have interfered with Ms. Porretto's business relationships, retaliated against her, and harassed her.

135.    These are tort claims for which Ms. Porretto should be entitled to fair and just damages.

**Count IX: Violation of Texas Water Code**

136.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

137.     Defendants failed to construct, erect or install sufficient barriers to prevent surface water from being diverted and impounded on Porretto Beach whether from Stewart Beach, fire hydrants deliberately opened to flow during inclement weather exacerbating the surface water flooding Porretto Beach, or from water leaks.

138.     Defendants acted in concert to approve modifications to public property to divert and impound the natural flow of surface waters from and around the ground and streets on the adjacent property to Porretto Beach in a manner that has damaged and continues to damage Porretto Beach and impacted operations at the beach decreasing revenue.

139.     The Defendants' actions, omissions and/or inactions violate Tex. Water Code 11.086(a).

140.     In the alternative, the Park Board's actions and potentially the other Defendants' actions, omissions, and/or inactions were done with malice.

141.     Further, in the alternative, the Defendants' actions were negligent.

**Count X: Claim for Accounting and Reimbursement**

142.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

143.     The Park Board, City and GLO should be required to provide an accounting of all funds received for funding requests of any sort which reference any part of Porretto Beach in the application for such funding, supporting documentation, or in any way related to the basis for such funding.

144.     Porretto should receive a pro rata share of the funding which was never used for the improvement of Porretto Beach.

**Count XI: Injunctive Relief**

145.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

146.    The Defendants should be permanently enjoined from referring to Porretto Beach as if it is part of the public property.

147.    The Park Board repeatedly refers globally to beaches lumping in non-public property creating misinformation and misleading the public, which furthers confusion, dissension and conflict.

148.    The Defendants should be enjoined from any further construction or alteration of the Stewart Beach land without an agreement with Porretto Beach.

149.    The Defendants should be enjoined from providing any false erosion and accretion data.

**Count XII:  Declaratory Judgment that Right of Ways Have Already Been Abandoned**

150.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

151.    Porretto seeks a declaratory judgment that the rights of ways claimed by the City of Galveston on Porretto Beach property be deemed terminated or abandoned.

152.    Porretto consistently controlled the area that the where the City alleges its rights of ways are located with bollards and ropes. This was the case for well over ten years prior to the Chapter 11 Bankruptcy filing and since that time Porretto and/or the Trustee have continued to maintain that control.

153.    Alternatively, the City has never created any roads and on information and belief never designated roads on Porretto Beach.

154.    Further, the City has admitted that it never built roads and never intends to build roads or alleyways on the property in the future.

**Count XIII:  Declaratory Judgment Regarding Mineral Interests and Boundaries**

155.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

156.    Ms. Porretto seeks a declaratory judgment recognizing her property rights to the property identified in the Abandonment Order includes all mineral interests and seeks a determination of the boundaries for any submerged lands which are alleged to be State owned.

**Count XIV: Violation Under Tort Claims Act**

157.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

158.    In the alternative, the Defendants actions, including negligence, have denied Porretto the use and enjoyment of her property and caused a diminution in the market value of Porretto's private property substantially damaging the land.

159.    The Defendants acted under color of the Texas Tort Claims Act which provides that a governmental entity may be liable for damages arising from its governmental functions, which are those functions that are vested in an entity by law and are given to it by the State as part of the State's sovereignty, to be exercised in the public interest. *See*, §101.0215(a)(33).

**PRAYER**

Plaintiff prays that the Court:

A. Enter judgment in Plaintiff's favor against the Defendants finding that Plaintiff is entitled to recover just compensation for the takings alleged above and such other appropriate relief as the Court deems just and proper in an amount to be determined by the trier of fact.

B. Enter relief in favor of the Plaintiff on all counts.

B. Award Plaintiff her reasonable and necessary attorney's fees, litigation expenses, and court costs, including appraisal, expert witness, and engineering fees, plus appropriate pre- and post-judgment interest;

C. Enter a judgment in favor of the Plaintiff on all other Counts and award of attorney's fees, pre-judgment interest, and post-judgment interest; and,

D. Award Plaintiff all other general, legal, and equitable relief which this Court is empowered to provide, and to which Plaintiff is entitled, including but not limited to a finding that Ms. Porretto owns all of the property in her deed, including submerged lands and mineral interests.

Dated: November 13, 2021.

Respectfully submitted,

*/s/ Deirdre Carey Brown*
Deirdre Carey Brown, pllc
State Bar No. 24049116
FORSHEY & PROSTOK LLP
1990 Post Oak Blvd, Suite 2400
Houston, TX 77056
Telephone: (832) 536-6910
Facsimile: (832) 310-1172
dbrown@forsheyprostock.com

**ATTORNEY FOR SONYA PORRETTO**

# EXHIBIT 1

**21 - 026**

CITY SECRETARY'S OFFICE
RECEIVED
APR 16 2021
CITY OF GALVESTON

**DATE:**     APRIL 15, 2021

**TO:**      **City of Galveston City Attorney, Donald Glywasky,**
         City of Galveston City Manager Brian Maxwell in care of
         All City of Galveston Elected Council Members,
         City Planning Department, Permitting,
         Coastal Planning Division Department And Permitting,
         and City Planning Commission

**LOCATION:** 823 Rosenberg Street
         Galveston, Texas 77550

**FROM:**    Sonya Porretto
         7 East Dansby Drive
         Galveston, Texas 77551

**VIA:**     PROMPT PROCESSING

**RE:**      **DEMAND TO CEASE, DESIST AND OBJECTION**

---

As the sole and rightfully third generation owner of historical private owned properties on Galveston Island, Texas, in Galveston County, Texas, more 'legally' described in the attached hereto, as Exhibit "A" AKA Porretto Beaches, please allow this document to serve as my official and final notice served upon the City of Galveston City Manager, Brian Maxwell in care of all City Council Members, City Coastal and Planning Departments, also served upon City of Galveston City Attorney, Donald Glywasky, on behalf of the City of Galveston, also served upon the City of Galveston Park Board of Trustees, Executive Director, Kelly DeSchaun, and/or her agent(s) in care of all City of Galveston Park Board Members and it's departments, committees, boards, groups or similar - this Cease, Desist and Objection to the listed actions outlined as follows:

1.     **Demand to Cease and Desist** intentional interference with my business operations and violation of my private property rights in all aspects as it pertains to my historical private owned properties aka Porretto Beaches and the rights exercised as memorialized for 70 years. Identified properties are described as required by law in 'legal property description' listed in the attached, hereto, as Exhibit "A".

2.     **Demand to Cease and Desist** misrepresentations to the public, government, local, federal, state, nonprofits, private and or other entities, organizations, plans and or programs in an effort to falsely claim ownership, provide erroneous erosion data, collect monies and or make applications that were not extended to myself as the true property owner or purpose intended. Misrepresentations including, but not limited to, beach access plans, disaster FEMA funds, erosion response plans, United States Army Corps of Engineers permitting, beach renourishment plans, and numerous other of the same which a process is taken to secure money and collected

1


CTH - 04/15/2021
D.B. Puccetti

for my accreting, dry or stable historical private owned properties/land parcels I own without my knowledge or authorization.

3.      **Demand to Cease and Desist** intentional deceptive and false statements written or verbal, describing or identifying my historical private owned properties as "submerged" or "state owned submerged", "eroding" or "city owned" or "reclaimed submerged city or state owned land/property of the 1993/1994 renourishment."

4.      **Demand to Cease and Desist** intentional theft, physical and other damage taken to Porretto Historical Private Owned Properties including, but not limited to, Galveston Park Board of Trustees and their agents or representatives allegedly performing beach nourishment, dredging, dumping or Beachfront and Shoreline cleaning and maintenance including the adjacent and adjoining properties of mine that are owned by the City such as Stewart Beach and Seawall Beaches, using heavy equipment i.e., front end loaders, excavators, dump trucks and/or pipelines without my authorization.

5.      **Demand to Cease and Desist** any current and or future planned dredged, dumped sand and other materials and placement on my private properties and or adjacent to and or any use of heavy equipment and placement of pipelines in order to perform the same illegal and unauthorized activities on adjoining and adjacent to any of my properties listed in **Exhibit A**.

Actions taken such as the outlined above have led to the submission of this cease and desist letter along with my objection to the following:

6.      **I OBJECT TO THE FOLLOWING CITY OF GALVESTON AND GALVESTON PARK BOARD PERMITTED AND OR UNPERMITTED ACTIVITIES TO OCCUR ON, ADJACENT TO OR ADJOINING MY PRIVATE PROPERTIES LISTED IN EXHIBIT A AS YOU DO NOT HAVE MY AUTHORIZATION OR EASEMENT REQUIRED BY LAW:**

(A)      2021 Seawall Beach Renourishment Project

AND

(B)      Stewart Beach ``Drainage Project''

I object to the proposed 2021 Seawall Beach Renourishment Project, dredging and dumping of dredge materials onto my private owned or city owned adjacent property adjoining my historical private owned properties including, but not limited to, Stewart Beach and or any other beaches and properties adjacent to and adjoining private properties legally described in the attached hereto, as Exhibit "A".

2

I object to the proposed 2021 Seawall Beach Renourishment Project because it began and continues to be utilized to perpetuate fraud, various other unlawful activities intentionally left unresolved causing irreparable damage and harm to citizens, tax payers, me, my family and historical private owned properties. All of which has been intentionally, knowingly and willfully concealed by each of you to gain benefit at my deprivation.

Despite my repeated attempts to cease, report and prevent illegal activities of the Park Board causing damage to mine and the adjacent beachfront and shoreline properties - the City continued allowing the continuous ongoing damage and fraud involving the Galveston Park Board of Trustees deceptive beach erosion projects, renourishment, beach cleaning and maintenance to persist. All of which consist of illegal mining, excavation and theft of sand. For years you allowed these activities to occur and denied me protection of my late fathers rights and my rights from 2005 until currently that I am entitled. You provided no protection, enforcement and chose not to take any corrective measures for mine and other properties damaged to date.

Park Board illegal activity and abuse resulted in evident long term and short term damage to my private properties and the adjacent city's Stewart Beach property causing flooding. You are proposing to perpetuate further illegalities by pursuing public monies to repair Stewart Beach flooding caused by the Park Board non-compliance lowering the surface elevation. The City chose not to address or take any corrective measures for mine or the surrounding properties negatively impacted due to the Park Board of Trustees illegal maintenance, excavation of Stewart Beach and all other beaches they were entrusted. Instead, you are retaliating against me for my pursuit to stand and protect my family's historical properties and business operations for over 70 years.

**Staff Report BF-086 of the Stewart Beach Drainage Project,** page 2, paragraph 1 & 2, uses **UTBEG Shoreline change rate from "1950's to 2012"** to apply to Porretto Beach. These rates are knowingly and intentionally false which is why you won't utilize any current rates to 2020-2021. My property is not eroding -1.5 + 0.9 feet a year and this gross false statement is made to further deceive the public, decision makers, funding sources and tax payers. Misrepresenting the accurate facts and shoreline data of my properties and other beachfront shoreline properties currently in 2021 is because the correct shoreline data confirms my allegations since 2010 are proven true.

When removing the Galveston park board of trustees off my properties, beachfront and shorelines since 2010 resulted in evident, obvious, gross accretions (growth of beaches and shorelines). The City and Park Board took deceptive actions to prevent me from exposing this truth, facts evidence and scientific data being concealed today to perpetuate your fraud.

The false erosion rates you continue to apply to my properties and others currently is done to intentionally misrepresent boundaries, prevent, obstruct uses and deny permits for private property while simultaneously concealing the fact you were notified repeatedly over the years that the Galveston Park Board of Trustees have been illegally excavating and mining sand from our accreting private properties and adjacent City properties including Stewart Beach. In choosing to ignore me the protection I deserved, you directly allowed the illegal actions of the

Park Board to persist for years causing long term and short term damage not only to my private properties but the city's also which includes but not limited to flooding.

Your use of deceptive and false erosion data applied to my adjacent private properties serves to violate my rights, damage my properties and take our land for the city, park board and your conflicts of interest gain and benefit.

If the Stewart Beach Drainage Project occurs based on these false rates of elevations and erosion in order to raise raising Stewart Beach from flooding while knowingly and intentionally serving to flood the surrounding properties more than they currently have been damaged, I will take any means necessary to protect me and my rights from this continued abuse. The false rates are used by you to prevent me from uses, permitting on my properties, prevent the public from being made aware of your illegal activities, allows you to obtain erosion and other funding, prevents decision makers from being provided the true accurate facts to make an educated, proper, ethical and conscientious decision on behalf of the citizens of Galveston and community.

I object to the proposed Stewart Beach Drainage Project because you chose to ignore the pleas of the surrounding private property owners for years in order to continue perpetuating illegal activities by the Galveston Park Board causing intentional damage by illegally removing sand from city owned and my accreting, dry and stable properties without my authorization in order to falsely identity my properties as eroding or submerged to qualify for erosion funding.

As of today, no good faith effort or corrective measures on behalf of me and my private properties listed in **Exhibit "A"** have been taken yet, you are making extreme progress and taking aggressive actions to acquire funding to repair Stewart Beach Parking Lot damaged by the Park Board through prior funding. These actions reward illegal activities of the Park Board, misuse of public funds, deceive the tax payers and allow the city who worked in concert with the Park Board to freely abuse power, retaliate, silence private property and small business owners then work with various conflicts of interest to prevent me from being protected from the Park Board's crimes the city benefits from.

No easement request has been made to me or will be provided by me.

No notice was provided or sent to me as an adjacent, adjoining private property owner within 200 feet of the project by the city or park board despite having a direct impact on me, my historical private properties, business and uses.

No environmental impact statement has been performed or engineering report has been completed to decide for the Stewart Beach Drainage Project, this should be required.

**Enclosure: 1**

# EXHIBIT "A"

## Porretto Private Property Legal Description

Tract B:
Lots Eight (8), Nine (9), Ten (10), Eleven (11), Twelve (12), Thirteen (13), and Fourteen (14), in Block Six (6), in the City and County of Galveston County, Texas and only being all of those portions of the subject property lying South of the Seawall, together with that portion of the adjacent Street(s) and Alleys abandoned as set forth in Ordinance No. 78-46.

Tract C:
The Southerly portion of Lot Ten (10) of Block Sixty-seven (67), all in the City and County of Galveston, Texas and only being all of those portions of the subject property lying South of the Seawall.

Tract D:
Lots One (1), Two (2), Three (3), in Block Seven (7), in the City and County of Galveston, Texas, and only being all of those portions of the subject property lying South of the Seawall.

Tract E:
Lots Eight (8), Nine (9), and Ten (10), in Block Seven (7), in the City and County of Galveston, Texas and only being all of those portions on the subject property lying South of the Seawall.

Tract F:
Lots Eight (8), Nine (9), Ten (10) and Eleven (11), in Block Eight (8), in the City and County of Galveston, Texas, Lots Seven (7), Eight (8), Nine (9), Ten (10), Eleven (11) and Twelve (12), in the Northeast Quarter of Out Lot Twenty-four(24), One (1) through Fourteen (14), inclusive, in the Southeast Quarter of Out Lot Twenty-four (24), Lots One (1), an interest in Lot Two (2), Three (3) through Fourteen (14), inclusive, in the Northwest Quarter of Out Lot Twenty-Five (25), Lots One(1), Through Fourteen (14), inclusive in the Northeast Quarter of Out Lot Twenty-five (25), Lots One (1), Through Fourteen (14), inclusive, in the Southwest Quarter of Out Lot Twenty-five (25) and Lots One (1), Through Fourteen (14), inclusive, in the Southeast Quarter of Out Lot Twenty-five (25), Lots One (1) through Fourteen (14) in the Northwest Quarter of Out Lot Fifty (50) and the entire Northeast Quarter of Out Lot Fifty (50), all in the City and County of Galveston, Texas, and only being all of those portions of the subject property lying South of the Seawall, together with that portion of the adjacent Street(s) and Alleys abandoned as set forth in Ordinance No. 78-46.

5

**Tract G:**
The Southeast Quarter, of Out Lot Forty-nine (49), all in the City and County of Galveston only being all of those portions of the subject property lying South of the Seawall.

**Tract H:**
The Southwest Quarter of Out Lot Forty-nine (49), all in the City and County of Galveston only being all of those portions of the subject property lying South of the Seawall.

**Tract I:**
Lots Eight (8), through Ten (10), inclusive, and the East one-half (1/2) of Lot Eleven (11), in the Northeast Quarter of Out Lot Forty-eight (48) all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall.

**Tract J:**
The Northwest Quarter of Out Lot Seventy-two (72), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

**Tract K:**
The Southwest Quarter of Out Lot Seventy-two (72), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

**Tract L:**
The Southeast Quarter, of Out Lot Seventy-One (71), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

**Tract M:**
The Northeast Quarter of Out Lot One hundred-nineteen (119), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

**Tract N:**
The Southeast Quarter, of Out Lot One hundred-nineteen (119), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

**Tract O:**
Part of Lots Eight (8) through Thirteen (13), inclusive, of the Northwest Quarter of Out Lot One hundred forty-one (141), all in the City and County of Galveston

and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

Tract P:
Lots One (1) through seven (7), inclusive, of the Southwest Quarter of Out Lot One hundred forty-one (141), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

Tract Q:
Lots Eight (8) through Fourteen (14), inclusive, of the Southwest Quarter of Out Lot One hundred forty-one (141), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

Filename:              Document2
Folder:
Template:              /Users/PorrettoBeach/Library/Group Containers/UBF8T346G9.Office/User
        Content.localized/Templates.localized/Normal.dotm
Title:
Subject:
Author:                Sonya Porretto
Keywords:
Comments:
Creation Date:         4/15/21 11:26:00 AM
Change Number:         1
Last Saved On:
Last Saved By:
Total Editing Time:    30 Minutes
Last Printed On:       4/15/21 12:13:00 PM
As of Last Complete Printing
     Number of Pages:      7
     Number of Words:      1,662 (approx.)
     Number of Characters:      9,480 (approx.)

# EXHIBIT 2



ESTABLISHED 1846

Carla Cotropia
Partner
Direct: 713.571.4204
ccotropia@millsshirley.com

Three Riverway, Ste. 670
Houston, Texas 77056 Tel-
ephone: 713.225.0547
Facsimile: 713.225.0844
www.millsshirley.com

April 21, 2021

Alexander Nelson
824 Avenue M 1/2
Galveston, TX 77550

**VIA nelson.h.alex@gmail.com**

  **Re: Porretto Beach littering and/or dumping onto public property.**

Mr. Nelson:

This letter is to inform you that a Porretto Beach ("Porretto") staff member was caught putting numerous bags of trash from Porretto beside trash cans located on a public beach, which is managed by the Galveston Island Park Board of Trustees of the City of Galveston's (the "Park Board"). This was an act of littering and/or public dumping.

On or about April 21, 2021 at 8:00 a.m., an employee of the Park Board witnessed the Porretto staff member placing approximately 15 large bags of trash next to a blue trash barrel, which is maintained by the Park Board for the benefit of the public, located on the public beach directly in front of Porretto's parking lot. *See* attached photographs.

Upon approaching him, the Porretto staff member ran away. On the same day, a few hours later, another employee of the Park Board witnessed the same man dumping more large bags of trash next to the same blue trash barrel located on the public beach directly in front of Porretto's parking lot. *See* attached photographs.

Like any other private entity or person, Porretto is responsible for disposing of its own trash. Instead of doing so, Porretto decided to make it the public's problem by dumping and/or littering its trash onto public property and, consequently, necessitating the Park Board to dispose of the trash properly. *See* attached photographs.

This behavior is unacceptable, and you are—hereby—given notice that if Porretto does not immediately cease littering and/or dumping its trash onto public property, the Park Board will be forced to act, including notifying the police and/or the City of Galveston's Code Enforcement Division, seeking injunctive relief, and pursuing other remedies that might be available to it.

GALVESTON  HOUSTON


Mr. Alexander Nelson
Wednesday, April 21, 2021
Page 2 of 2

Yours very truly,

Carla Cotropia

Carla Cotropia

Case 3:21-cv-00259 Document 35 Filed in TXSD on 04/26/21 Page 60 of 72

Apr 21, 2021 7:57:27 AM
29.3013481N 94.7756344W



Apr 21, 2021 9:58:51 AM
29.30206833333334N 94.800905W
2911 Church Street
Galveston County
Texas





Apr 21, 2021 9:58:51 AM
29.30206833333334N 94.800905W
2911 Church Street
Galveston County
Texas

# EXHIBIT 3

From: "Williams, Randy W."
<Randy.Williams@tklaw.com<mailto:Randy.Williams@tklaw.com>>
Date: July 17, 2013, 5:18:00 PM EDT
To: "CCotropia@millsshirley.com<mailto:CCotropia@millsshirley.com>"
<CCotropia@millsshirley.com<mailto:CCotropia@millsshirley.com>>
Cc: "Parker, Nashira" <nashira.parker@tklaw.com<mailto:nashira.parker@tklaw.com>>
Subject: Porretto

I have gone back down to Galveston on several occasions since the last hearing and have
been looking at various maps and surveys of the West Beach property again.

I found the "red" markings on the Sea Wall between roughly 26th and 27th Streets. I am
guessing that these are the markings that have been referred to in the correspondence,
meetings and pleadings? I also noticed that there are some posts that run perpendicular to
the Sea Wall and seem to be in line with the red markings. I am not sure, but given the
angle of the streets, I believe the property line here would run at an angle, not
perpendicular?

In any event, while I have not given up on the idea that we put together written agreements
concerning the relationship with the Park Board, I want to be clear that for now, the Park
Board will not be conducting any operations on this stretch of beach, (it is claimed as
property of the estate), unless it is the "barber" rake to remove sea weed. No front end
loaders nor any Park concessionaries should be on this area without written permission
from me in advance or without a court order obtained after proper notice to me. I am not
giving permission for front end loaders to be used to remove sea weed. I do not want any

front end loaders or other heavy equipment on or near the property unless and until I can be physically present.

To the extent any further "permits" are requested for work in this area, I must be notified. I am concerned that I was not notified in the past when the permits were requested and granted, but I want to be clear, that I need to know what activity is taking place on the property in advance. I was also told that there was an attempt to make this part of the beach a "no swim" zone? If this is the case, why was I not notified of the proposal?

I appreciate that the work done in March was done by permit; however, I cannot reconcile the "planting" permit with the pictures of the front end loaders working in the area in March that is clearly between the red marks and posts? While I do not intend to pursue any claims to this activity at this time, I want to make it clear, that this work was done without notice to me and without my permission or authorization. To the extent it changed the elevation of the beach, I do not want there to be any question that this somehow was a "natural" or "authorized" alteration of the property boundaries.

I want the contact information for the Park Concessionaires that are adjacent to this part of the beach. I intend to contact them to explain the situation with the bankruptcy and so that they will have my contact information if a problem comes up.

I want to do this in advance of any future issues with the remaining summer holidays, as I intend to "spot" check the area for activity, and if I see anyone other than the Porrettos on this part of the beach conducting business operations, I intend to not only report the trespass to the local authorities but also seek assistance from Judge Bohm to prohibit such activity.

I look forward to working with the Park Board to avoid future disputes.

Randy W. Williams
THOMPSON & KNIGHT LLP
Three Allen Center
333 Clay St., Suite 3300
Houston, Texas 77002
713-653-8645 direct
832-397-8181 fax
randy.williams@tklaw.com<mailto:randy.williams@tklaw.com>

PRIVILEGED & CONFIDENTIAL

The information contained in this e-mail may be (1) subject to attorney-client privilege; (2) subject to attorney work product privilege; and/or (3) confidential. It is intended only for the individual(s) designated above. You are hereby notified that any use, copying or distribution of the information contained in this transmission by anyone other than the recipient(s) named above is unauthorized and strictly prohibited. If you have received this transmission in error, please notify the sender immediately.

**Schel Heydenburg**

| | |
|---|---|
| **From:** | Carla Cotropia <ccotropia@millsshirley.com> |
| **Sent:** | Tuesday, May 26, 2015 11:20 AM |
| **To:** | Scottie Aplin;David Land;Ken Cross;Casey Roy |
| **Cc:** | Robert Booth;Kelly De Schaun |
| **Subject:** | Fwd: Porretto West |

Randy is mad because I am wanting to establish the boundary. He wants to just act like the estate owns everything.  I told him the renourishment goes to the favor of the state. He should have just accepted the mertein line but since he doesn't understand all of this he just lashes out at the PB. We want to file a motion to lift the stay once we get all the info we need to move forward.  My partner Robert Booth will be helping with the bankruptcy filing.

Best,

Carla Cotropia

713-571-4204

Subscribe to my blog:
http://www.cotropiaworkshops.com/index.php/blog/

Begin forwarded message:

> **From:** Robert Booth <rbooth@millsshirley.com>
> **Date:** May 26, 2015 at 10:00:31 AM CDT
> **To:** Carla Cotropia <ccotropia@millsshirley.com>
> **Subject: Re: Porretto West**
>
> Carla.
>
> We need a survey showing Poretto Beach west with the following lines.
>
> Merten Line as referred to in the judgment
> The Post Ike prenourishment MHHT line
> The Post Ike PostNourshment MHHT Line
> The Current MHHT line
>
> How do you want to approach Kelly about this? We need to get Blaskey working ASAP.
>
> Robert
>
> _____
> Robert E. Booth
> Mills Shirley LLP
> 2228 Mechanic St., Ste 400
> Galveston, Texas 77550
> 409.761.4001 Office
> 281.451.7630 Mobile
> 409.877.1635 Fax
> rbooth@millsshirley.com

1

Celebrating our 168th year
www.millsshirley.com
Houston - Galveston

On May 26, 2015, at 9:53 AM, Carla Cotropia <ccotropia@millsshirley.com> wrote:

As we discussed on Friday we need to stand off Porreto Beach West, I have a call today with the GLO re this. It is my understanding that if he doesn't want to use the Mertein line the renourishment would have to be considered. I told Randy that it was my understanding that the Mertein line was more advantageous to the Estate than any current line. The current line would include the renourishment which is a benefit to the State not the Estate.

The good news is this is forcing Randy to deal with the issue.

His big hammer is the violation of the bankruptcy stay which is a very big hammer. We need to make sure we don't give him any reason to try to sue us. There was no harm done since we pulled everyone off. I don't know what he is referring to concerning 14th and 15th.

Carla Cotropia

713-571-4204

Subscribe to my blog: http://www.cotropiaworkshops.com/index.php/blog/

Begin forwarded message:

> **From:** "Williams, Randy W." <Randy.Williams@tklaw.com>
> **Date:** May 26, 2015 at 9:37:24 AM CDT
> **To:** Carla Cotropia <ccotropia@millsshirley.com>
> **Cc:** Angela Olalde <aolalde@greerherz.com>, Andrew Mytelka
> <AMytelka@greerherz.com>, Stephen Schulz
> <SSchulz@greerherz.com>, "Douglas Godinich" <dtglaw1@aol.com>,
> "Parker, Nashira" <nashira.parker@tklaw.com>
> **Subject: Re: Our office is closed today**
>
> Let me get with Greer Herz on the boundary issue. The exhibit with the survey was descriptive. Given that the boundaries change as the mean high tide changes, I don't believe that it set the boundary for all time, I just don't think you can do that, but let me talk with them and get a "legal" answer for you.
>
> The bottom line is that the Park Board is on notice that the estate is claiming all of the lots in the judgment. If they want to do a current survey and set lines then we can certainly talk about that, but the bottom line of my issues from last week is that the Park Board, Kelly, deliberately set about a plan this weekend to disrupt my tenant's plans to use the property she had leased.

It was reported to me by the police that "alleged" Park Board concessionaires (they had no paper work) were told by "Mario" with the Park Board that they should enter the lots between 14th and 15th.

While they left, I have asked for the Police Report and if it provides details that support these allegations, I intend to sue the Park Board for violation of the automatic stay and to request a permanent injunction that prohibits the Board, Kelly and Mario from going anywhere near estate property or even talking to anyone about it.

As far as "buying" the lots, I have previously turned down an offer of $200,000 for two lots west of Pleasure Pier.  That said, I have no established purchase price and the Board is free to make any written legitimate offer that they want.  They have access to more information than I do about Galveston Property values.

I will get back with you on the boundary issue and we can discuss a call then.

Randy W. Williams
THOMPSON & KNIGHT LLP
Partner
Three Allen Center
333 Clay St., Suite 3300
Houston, Texas 77002
713-653-8645 direct
832-397-8181 fax
randy.williams@tklaw.com
vCard

# THOMPSON & KNIGHT LLP

ATTORNEYS AND COUNSELORS

THREE ALLEN CENTER
333 CLAY STREET • SUITE 3300
HOUSTON, TEXAS 77002-4499
(713) 654-8111
FAX (713) 654-1871
www.tklaw.com

AUSTIN
DALLAS
FORT WORTH
HOUSTON
LOS ANGELES
NEW YORK
SAN FRANCISCO

ALGIERS
LONDON
MONTERREY
PARIS

July 17, 2014

**Via First Class Mail, Postage Prepaid**
**And Via E-mail (ccotropia@millsshirley.com)**

Carla Cotropia
Mills Shirley L.L.P.
1021 Main Street, Suite 1950
Houston, Texas 77002

Re: *In re Sonya M. Porretto*; Case No. 09-35324; U.S. Bankruptcy Court for the Southern District of Texas (Houston Division)

Dear Carla,

The Texas Supreme Court ruled in favor of the Porretto's title as found by the State District Court. You may recall that last year, I sent a letter directing that the Park Board and its employees refrain from entry upon any of the estate property. I must reaffirm that position.

Last weekend, Park Board employees operating front end equipment were removing sand and seaweed from estate property between 14th and 16th Streets. It is troubling to me that this action comes so soon after the Supreme Court's decision and also coincides with efforts that I know are underway to take new shoreline surveys.

I appreciate that it is the Park Board's position that it must maintain the beaches for public use in the public easement; that front end loaders are necessary to do the work; and that only a limited amount of sand is "removed." Nonetheless, no one consulted with me before the work was performed on estate property; no one received my permission to enter the property; and I can find no evidence that permits were obtained to "move" or "remove" sand from the property or the general area.

I also appreciate that you will blame my complaint on reports I received from Ms. Porretto. This would be untrue as the entry was reported by someone unrelated to any of the Porrettos who saw the equipment on the beach. I also saw evidence myself of the tracks and marks from the equipment after the incident that were not within the public beach easement.

In addition, while not on estate property, I witnessed, after it was reported to me, that front end loaders on Stewart Beach effectively cut a channel between Stewart Beach and estate property. The channel is created when sand is removed when the vehicles are being turned to stay on Stewart Beach and the sand is then dumped on Stewart Beach. It is obvious that this is being done to capture sand that would otherwise accrete on estate property. Undoubtedly you will also dispute this position, but in any event, this is not a complaint based on a report from the

518978 000002 10584236.2

July 17, 2014
Page 2

Porrettos. I have seen this activity, I have seen the channel, and I have never seen this before this summer.

I also want to bring to your attention that the last time when I was at the area near the boundary of Stewart Beach and estate property (that is being used by the Park Board for free parking) that trash and refuse were abundant as was evidence of "camp fires." Some of these were near or under the abandoned restaurant near the free parking. Neither the free parking, nor the abandoned restaurant are estate property, but the failure to have adequate trash gathering and clean up in this area, as well as the lack of any visible patrolling that has allowed these fires to be built is all a nuisance and potential hazard.

While I can do nothing about the lack of trash pick up and safety on County or other private property, I can rightfully insist that the use of front end loaders adjacent to or on estate property cease. The title issue is over, and the estate's rights in and to the property should no longer be the subject of interference by the Park Board as I understand that its jurisdiction extends only to the public beach for which it is responsible.

In the event I receive any further evidence that Park Board employees are entering and/or interfering with the estate property, I will inform Judge Bohm and ask for the assistance of the Bankruptcy Court in having such action stopped.

Sincerely,

Randy W. Williams
Chapter 7 Trustee for the Estate of Sonya Porretto