# ATTACHMENT 1

Final Judgment, *Porretto v. Tex. Gen. Land Off.*, No. 02CV0295 (212th Dist. Ct., Galveston Cnty., Tex. Apr. 9, 2015)

CAUSE NO. 02CV0295     2015 APR -9 PM 3: 12

| | | |
|---|---|---|
| **ROSEMARIE PORRETTO, et al.,** | § | **IN THE DISTRICT COURT OF** |
| **Plaintiffs,** | § | |
| | § | DISTRICT CLERK |
| **VS.** | § | GALVESTON COUNTY, TEXAS |
| | § | **GALVESTON COUNTY, TEXAS** |
| **TEXAS GENERAL LAND OFFICE, et** | § | |
| **al.,** | § | **212ᵗʰ JUDICIAL DISTRICT** |
| **Defendants** | | |

### FINAL JUDGMENT

This case was tried in part before a jury, and in part to the trial court, beginning January 12, 2009. This Court entered a final judgment on March 4, 2009. An appeal was taken to the First Court of Appeals, and a petition for review was filed in the Texas Supreme Court. On July 3, 2014, the Texas Supreme Court issued its Opinion in *Rosemarie Porretto and Randy W. Williams, as Ch. 7 Trustee of the Bankruptcy Estate of Sonya Porretto v. Tex. Gen'l Land Office and Jerry Patterson, in his Official Capacity as Texas Land Commissioner*, 448 S.W.3d 393 (Tex. 2014) ("Opinion" attached hereto as Appendix A). On December 19, 2014, the Texas Supreme Court issued its mandate, remanding the case to this Court for rendition of judgment in accordance with its Opinion. The background of this case is set out in the Opinion.

The current parties to this case are:

1. Plaintiffs:

     a. Rosemarie Porretto, and

     b. Randy W. Williams, as the Chapter 7 Trustee of the Bankruptcy Estate of Sonya Porretto (collectively referred to as "Plaintiffs");[1]

2. The State:

     a. the Texas General Land Office, and

---

[1] At the time this Court's final judgment issued on March 4, 2009, the Plaintiffs were Sonya Porretto and Rosemarie Porretto. While the appeal was pending, Sonya Porretto filed for bankruptcy protection, and the bankruptcy proceedings were converted to a Chapter 7 proceeding.

1

02-CV-0295
DCAGJF
Agreed Judgment – Final – OCA
1020045

      b. George P. Bush, in his Official Capacity as Texas Land Commissioner (the Texas General Land Office and the Land Commissioner are collectively referred to herein as the "State Defendants");[2]

3. <u>The Park Board</u>:

      a. The Park Board of Trustees of the City of Galveston, Texas (the "Park Board"), and

      b. Kelly de Schaun as the Executive Director of the Park Board of Trustees of the City of Galveston, Texas ("Executive Director").[3]

The claims at trial concerned the property described in detail in the property description and survey attached as Appendices B and C to this Final Judgment, which are incorporated herein by reference. The line of mean higher high tide ("MHHT") is the shoreline boundary marking State-owned submerged land with respect to the property at issue. The MHHT line is "the average of highest daily water computed over or corrected to the regular tidal cycle of 18.6 years." *See Porretto*, 448 S.W.3d at 395 (citing *Luttes v. State*, 324 S.W.2d 167, 187 (Tex. 1958)). The MHHT line is always moving. *Id.*

Pursuant to the mandate of the Texas Supreme Court, this Court enters this final judgment and hereby ORDERS, ADJUDGES, and DECREES that:

1. As against the Defendant Land Commissioner only, the Court declares title as follows to the tracts of land listed and described in Appendix B attached hereto: Plaintiffs own fee simple title to this land to the extent the land lies landward of the MHHT line ("the Property"). The State of Texas owns this land to the extent the land lies seaward of the MHHT line. The property survey attached as Appendix C to this Final Judgment depicts the location of the MHHT line for the Property as of the dates indicated in that survey.

---

[2] At the time the Texas Supreme Court issued its mandate, Jerry Patterson served as Texas' Land Commissioner. George P. Bush was elected on November 4, 2014, and he took office on or about January 2, 2015.

[3] At the time of this Court's final judgment on March 4, 2009, Lou Muller served as the Executive Director for the Park Board of Trustees. Kelly de Schaun began serving as Executive Director before the Texas Supreme Court issued its mandate. At trial, Plaintiffs submitted no takings claims against the Park Board or its Executive Director.

2

2. The State Defendants did not commit a compensable taking of the Property under the Texas Constitution, and the Court enters a take-nothing judgment in favor of the State Defendants on the Plaintiffs' takings claims.

3. The Plaintiffs' claim that application of the Open Beaches Act ("OBA")[4] to require permitting for sand scraping or removal operates as an unconstitutional ex post facto law because the Plaintiffs owned the Property before the OBA was enacted was not ripe for adjudication, and is therefore dismissed.

4. As determined in this Court's January 16, 2009 Order sanctioning the State Defendants, which is attached hereto as Appendix D and incorporated herein, the State Defendants violated Texas Rule of Civil Procedure 196.3(c) by failing to make a reasonable effort to locate responsive documents during discovery in this case. The State is hereby ORDERED to reimburse Plaintiffs $19,349.52 for attorneys' fees and expenses as sanctions for the State Defendants' discovery abuses.

5. Plaintiffs are entitled to recover from the State Defendants post-judgment interest at a rate of 5% per annum, compounding annually, from the date of this Final Judgment until this Final Judgment is satisfied.

6. The Plaintiffs have dedicated an easement in favor of the public on the Property. The Plaintiffs have indicated the necessary donative intent historically through words and actions that, despite their private ownership and upkeep of the Property, the public is welcome to use and enjoy specific portions of the Property, subject to the Plaintiffs' dedicated public easement.

7. The dedicated public easement on the Property that lies between 6th and 10th Streets is, and has been, delineated by large wooden stakes known as bollards or cross-ties. The public has free and open access to the Property seaward of these bollards with rights of ingress and egress from the adjacent beaches. The Plaintiffs' dedicated public easement does not include a right of ingress and egress from the seawall. Public vehicular access to the Property located between 6th and 10th Streets landward of the bollards is limited to those who pay the Plaintiffs or their successors-in-interest a fee for parking. The Plaintiffs have reserved the right to control all commercial operations and leases within this easement, and the uses of the easement are limited to those posted on the Porretto Beach Rules Sign, as shown on Plaintiffs' Trial Exhibit 21, which is attached to this Final Judgment as Appendix E and incorporated herein by reference.

8. On the Property that lies between 10th and 27th Streets, the Plaintiffs have dedicated an easement in favor of the public from the mean low tide line to an area one hundred (100) feet landward. This easement includes a right of ingress and egress from the seawall.

---

[4] Act of July 16, 1959, 56th Leg., 2nd C.S., ch. 19, 1959 Tex. Gen. Laws 108 (currently codified as TEX. NAT. RES. CODE §§ 61.001-.254).

3

9. The Property between 6th and 10th streets in front of (seaward of) the Galveston seawall is accreting sand and has been doing so for at least the past twenty-four (24) years.

10. The State Defendants did not breach the Settlement in Principle Agreement, and the Court enters a take-nothing judgment in favor of the State Defendants against Plaintiffs' on their breach of contract claim.

The Court adopts the holdings as stated in the attached Opinion. *See* Appendix A.

All other relief requested in this case is hereby denied. This judgment disposes of all parties and all claims and is final and appealable. To the fullest extent allowed by law, the Court orders execution to issue for this judgment.

DONE this _9_ day of _April_____, 2015.

_____
Judge Presiding

4

**Index of Appendices to Final Judgment**

| Appendix | Description |
|---|---|
| A | Opinion - *Rosemarie Porretto, et al v. Tex. Gen'l Land Office, et al*, 448 S.W.3d 393 (Tex. 2014) |
| B | Property Description (Am. Ex. A to Plaintiffs' Second Amended Petition) |
| C | Property Survey (Plaintiffs' trial exhibit 5) |
| D | January 16, 2009 Order Sanctioning the State Defendants |
| E | Porretto Beach Rules Sign (Plaintiffs' trial exhibit 21) |

448 S.W.3d 393
Supreme Court of Texas.

Rosemarie PORRETTO and Randy W. Williams,
as Chapter 7 Trustee of the Bankruptcy
Estate of Sonya Porretto, Petitioners,
v.

TEXAS GENERAL LAND OFFICE and
Jerry Patterson, in his Official Capacity as
Texas Land Commissioner, Respondents.

No. 12–0483.  |  Argued Nov. 5,
2013.  |  Decided July 3, 2014.
|  Rehearing Denied Dec. 19, 2014.

### Synopsis

**Background:** Landowners brought action against General Land Office (GLO), Land Commissioner, city park board, and park board's executive director, alleging that defendants interfered with their ownership of beachfront property and took it without just compensation. The 212th District Court, Galveston County, Susan Elizabeth Criss, J., dismissed the action, and landowners appealed. The Court of Appeals, 251 S.W.3d 701, affirmed in part, reversed in part, and remanded. On remand, the District Court quieted title in favor of landowners and awarded judgment on jury verdict on takings claim. State appealed. The Court of Appeals, 369 S.W.3d 276, reversed. Landowners petitioned for review.

**[Holding:]** The Supreme Court, Hecht, C.J., held that conduct of GLO was not a compensable "taking."

Affirmed in part, reversed in part, and remanded.

### Attorneys and Law Firms

*394 J. David Breemer, Pacific Legal Foundation, Sacremento, CA, Ted Hirtz, Attorney at Law, Houston, TX, for Amicus Curiae Pacific Legal Foundation.

Andrew J. Mytelka, Kelly Ann Fayette Clarke, Greer Herz & Adams LLP, Galveston, TX, Angela Olalde, Greer Herz & Adams, LLP., League City, TX, Austin Webber, Stephen G. Schulz, Galveston, TX, Lucie Margaret Tredennick, Houston, TX, for Petitioner Randy W. Williams.

Barbara Bryant Deane, Assistant Attorney General, Austin, TX, Bruce E. Ramage, Martin Disiere Jefferson & Wisdom LLP, Houston, TX, Kenneth Cross, Office of the Attorney General, Austin, TX, Leonard H. Simon, Boyar Simon & Miller, Houston, TX, Levon G. Hovnatanian, Martin Disiere Jefferson & Wisdom LLP, Houston, TX, Liz Bills, Ryan Fite, Austin, TX, for Respondent Texas General Land Office.

### Opinion

Chief Justice HECHT delivered the opinion of the Court.

The principal issue before us is whether the State's repeated recharacterization of private property as public constitutes a compensable taking under Article I, Section 17(a) of the Texas Constitution.[1] Though the State's conduct is troubling, it is not a taking. We affirm the court of appeals on that issue,[2] but we reverse on other issues and remand the case to the trial court for rendition of judgment.

[1]   TEX. CONST. art. I, § 17(a) ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made....").

[2]   369 S.W.3d 276 (Tex.App.-Houston [1st Dist.] 2011).

### I

### A

From the late 1950s through the early 1970s, the Porretto family acquired 17 tracts totaling some 27 acres located between *395 the Galveston Seawall and the Gulf of Mexico. The tracts were originally part of an 1838 conveyance of the east end of Galveston by the Republic of Texas to Michael B. Menard.[3] There was no Seawall then, of course, and the land conveyed was all dry, but much is now submerged, including some of the Porrettos' tracts. The Porrettos have operated one group of tracts as Porretto Beach, offering free access to the public, charging only for parking and concessions for beach amenities, like umbrellas, chairs, floats, and boats. The rest of the tracts, which the Porrettos call Porretto Beach West, are non-contiguous, undeveloped, and farther down the beach. All the property is now in Sonya Porretto's bankruptcy estate, and the trustee, Randy Williams, and Sonya's mother, Rosemarie, are petitioners here.[4] We refer to petitioners collectively as the Porrettos.

**APPENDIX A**

Porretto v. Texas General Land Office, 448 S.W.3d 393 (2014)

57 Tex. Sup. Ct. J. 971

3      *See City of Galveston v. Menard*, 23 Tex. 349, 357, 381 (1859).

4      Henry and Rosemarie filed this suit in 2002. At that time, they owned the land, but in 2005, they sold it to their daughter, Sonya, and she joined the suit. Henry died before trial.

The State owns the coastal land submerged by the Gulf of Mexico.[5] Along the Gulf Coast, there are two high tides daily. In 1958, we held in *Luttes v. State* that, based on Spanish and Mexican law applicable when Texas acquired its coastlands, the shoreline boundary of State-owned submerged land is the mean higher high tide line ("MHHT"), "the average of highest daily water computed over or corrected to the regular tidal cycle of 18.6 years."[6] The tidally submerged land up to the MHHT line is the "wet beach". Of course, water often reaches farther landward, to a line marked by vegetation or a change in terrain. This area, though sometimes submerged, is the "dry beach", which may be privately owned. The Texas coastline is constantly changing by accretion and avulsion, and thus the shoreline is always moving.[7]

5      *State v. Bradford*, 121 Tex. 515, 50 S.W.2d 1065, 1069 (1932) ("The rule long has been established in this state that the state is the owner of the soil underlying the navigable waters, such as navigable streams, as defined by statute, lakes, bays, inlets, and other areas within tidewater limits within its borders."); *Lorino v. Crawford Packing Co.,* 142 Tex. 51, 175 S.W.2d 410, 413 (1943) ("The soil covered by the bays, inlets, and arms of the Gulf of Mexico within tidewater limits belongs to the State, and constitutes public property that is held in trust for the use and benefit of all the people."). The Legislature has recognized the State's ownership. See TEX. WATER CODE § 11.021(a) ("The water of the ordinary flow, underflow, and tides of every flowing river, natural stream, and lake, and of every bay or arm of the Gulf of Mexico, and the storm water, floodwater, and rainwater of every river, natural stream, canyon, ravine, depression, and watershed in the state is the property of the state.").

6      159 Tex. 500, 324 S.W.2d 167, 187 (1958).

7      *Severance v. Patterson*, 370 S.W.3d 705, 708 (Tex.2012) ( "Oceanfront beaches change every day. Over time and sometimes rather suddenly, they shrink or grow, and the tide and vegetation lines may also shift. Beachfront property lines retract or extend as previously dry lands become submerged or submerged lands become dry.").

The State contended in *Luttes* that the shoreline was much farther landward,[8] including the dry beach, and it has been reluctant to accept the line set in *Luttes.* *396 Less than a year after that case was decided, the Legislature enacted the Open Beaches Act,[9] declaring it to be the public policy of this State that the public be allowed access to the Gulf across both the dry beach and the wet beach.[10] However, the Act did not mandate access across privately owned dry beach property without proof of some legal right,[11] and thus the declaration stopped short of a taking.[12] In *John G. and Marie Stella Kenedy Memorial Foundation v. Dewhurst,* which we decided in 2002, the State reasserted its pre-*Luttes* position that its ownership of the beach extends to the vegetation line, the highest reach of the water.[13] We again rejected that position and reaffirmed *Luttes.*[14] Just two years ago, in *Severance v. Patterson,* the State claimed a "rolling" public beachfront easement on the dry beach, in many respects indistinguishable from ownership. We rejected that claim, citing *Luttes.*[15]

8      *Luttes,* 324 S.W.2d at 169 ("We are not certain as to the State's view of just what this line is in terms of practical determination, but the contention seems to be that it is either the highest—most landward—line reached by the waters on any one occasion that can be proved or perhaps the average of single highest annual lines for such years as to which proof is available.").

9      Act of July 16, 1959, 56th Leg., 2nd C.S., ch. 19, 1959 Tex. Gen. Laws 108 (currently codified as TEX. NAT. RES.CODE §§ 61.001–.254).

10     *Id.* § 1 ("It is hereby declared and affirmed to be the public policy of this state that the public, individually and collectively, shall have the free and unrestricted right of ingress and egress to and from the state-owned beaches bordering on the seaward shore of the Gulf of Mexico, or such larger area extending from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico, in the event the public has acquired a right of use or easement to or over such area by prescription, dedication, or has retained a right by virtue of continuous right in the public.") (currently TEX. NAT. RES.CODE § 61.011(a)).

11     *Id.* § 2 ("In any action brought or defended under this Act or whose determination is affected by this Act a showing that the area in question is embraced within the area from mean low tide to the line of vegetation shall be prima facie evidence that: (1) the title of the littoral owner does

Porretto v. Texas General Land Office, 448 S.W.3d 393 (2014)

57 Tex. Sup. Ct. J. 971

not include the right to prevent the public from using the area for ingress and egress to the sea; (2) there has been imposed upon the area subject to proof of easement a prescriptive right or easement in favor of the public for ingress and egress to the sea.") (currently TEX. NAT. RES. CODE § 61.020(a)).

12    *Severance*, 370 S.W.3d at 719 ("The [Open Beaches Act] does not alter *Luttes*. It enforces the public's right to use the dry beach on private property where an easement exists and enforces public rights to use State-owned beaches. Therefore, the OBA, by its terms, does not create or diminish substantive property rights. The statute cannot truly be said to create any new rights. In promulgating the OBA, the Legislature seemed careful to preserve private property rights by emphasizing that the enforcement of public use of private beachfront property can occur when a historic right of use is retained in the public or is proven by dedication or prescription.") (citations omitted).

13    90 S.W.3d 268, 284 (Tex.2002).

14    *Id.* at 281.

15    *Severance*, 370 S.W.3d at 724 ("We have never held the dry beach to be encompassed in the public trust. *See Luttes* .... We hold that Texas does not recognize a 'rolling' easement.").

**B**

Luttes firmly established in 1958 that the boundary between submerged land owned by the State and the dry beach is the MHHT line. For the area at issue here, that line is below the Seawall, and the property conveyed to the Porrettos lies on both sides of the line, some of it in the dry beach and some in the wet beach. From 1994 to 2008, the General Land Office vacillated in denying, accepting, and ultimately conceding the Porrettos' ownership of the dry beach. The material events fall into five categories.

*GLO's Renourishment and Recreation Leases to the City of Galveston*. In 1994, the GLO, on behalf of the State, executed a ten-year lease of "submerged lands" to **\*397** the City of Galveston for "the deposit of beach quality sand in and on said submerged land for beach replenishment and restoration". The lease covered a large area "adjacent to and along the Galveston Seawall".[16] The lease did not define "submerged lands" but called for a survey to determine "the line of highest annual tide", well landward of the MHHT line, thus including the dry beach. The survey, performed by Darrell

Shine, located the highest annual tide line at the Seawall over most of the area. All of Porretto Beach West was included. The State executed a second lease of the same property to the City for 20 years "for the purpose of establishing and maintaining a public recreation area". Under the authority of that lease, the Galveston Park Board in 1999 authorized two concessionaires of its choosing to operate on Porretto Beach West.

16    The lease appears to have contemplated that all the land gulfward of the Seawall was "submerged land", reciting that "[t]he uplands property littoral to the submerged lands subject to this lease are owned by the County of Galveston". In other words, the submerged land bordered on the Seawall.

*GLO representatives' statements*. In 1997, while the City's renourishment project was ongoing, the Park Board expressed concern to the GLO that part of the area covered by the Shine survey was privately owned and that the owners, not the Park Board, would be entitled to beach concession revenues. A GLO staff attorney responded in a letter as follows:

As you are aware, the State, through the land office, has leased the replenished beach area in front of the Galveston Seawall to the City.... As you are further aware, the State does not recognize any claim of private ownership of land in front of the seawall.... The requirement of the park board that the concessionaire obtain consent of "certain adjacent property owners" ... ascribe [s] some credence to these specious claims in derogation of the State position and are, therefore, not acceptable.

A few days later, the GLO senior deputy commissioner and general counsel wrote an op-ed article for the *Galveston County Daily News* setting out the State's position that it owned the "Seawall beaches" and that concession revenues belonged to the Park Board. "[A]ny attempt to assert private property ownership in front of the Galveston Seawall," the general counsel wrote, "will be opposed by the state."[17] In a later meeting with Park Board officials, the two GLO lawyers made clear that "[t]here was no question on the part of the GLO that there [were] no valid private ownership claims" to the land seaward of the Seawall, per the Shine survey. Much of that land, including the Porrettos' property, was dry beach.

[17] The general counsel's article correctly acknowledged that "[f]or tidally influenced lands, the Texas Supreme Court has determined the actual boundary to be the line of 'mean high water' or 'mean higher high water,' depending on the date of the grant." But the article incorrectly stated that the Shine survey was based on mean high water when it was actually based on the highest annual tide. The article also misstated that the Court in *City of Galveston v. Mann*, 135 Tex. 319, 143 S.W.2d 1028 (1940), "found that there had been no fast land in front of the seawall for a period in excess of 20 years". The Court made no such finding but merely accepted the stipulation of the City and the Attorney General "that after the seawall was built, about 1905, the high tide of the Gulf about twenty years ago came up to said seawall and constantly since said time all of the land lying on the Gulf side of the seawall at the place where the pier is intended to be built has been within the high tide waters of the Gulf." *Id.* at 1030. And, of course, *Mann* was decided before *Luttes*, when shoreline boundaries were finally determined.

*The tax rolls.* Part of the Park Board's concern was that property covered by the **\*398** Shine survey was listed on the tax rolls in the names of private owners. At the State's request, the Galveston County Appraisal District changed its records to list the State as the owner of certain tracts, including part of Porretto Beach West. However, the Porretto family continued to pay the taxes, and the District continued to accept payments. In 2004, the District reversed the changes to its records.

*Letters from the Land Commissioner and the Attorney General.* In 1999, Sonya Porretto explored selling the property, then owned by her parents, but a potential buyer expressed concern about the GLO's claims. To clarify the GLO's position, Sonya met several times with the GLO, culminating in a meeting with the Land Commissioner himself in 2000. Responding to the issues she had raised, the Commissioner wrote her in 2001 that "the state does not claim title to natural accretion above the line of Mean High Tide in this particular area" and that he was "not aware of any claim by the State of Texas to the property your family claims (landward of the Mean High Tide line)". Meanwhile, Sonya had also raised her issues with the Attorney General's Office. A few days after the Land Commissioner letter, the Attorney General wrote that "[t]he State does not claim ownership of any property claimed by your father above the mean high tide line", although any land claimed "in front of the Galveston seawall ... is probably subject to a public easement". Both

letters appeared to be inconsistent with the GLO's position up to that point.[18] In any case, later that year, a contract to purchase the land was signed, but failed to come to fruition.

[18] By referencing the "mean high tide line" rather than the MHHT line, the letters from the Land Commissioner and the Attorney General slightly understated the State's rightful ownership. The MHHT line is based only on the higher of the two daily high tides on the Texas coast and is therefore higher than the mean high tide line, which is based on both. In this area, the difference is about 0.1 foot vertically, *see* William Gardner Winters, Jr., *The Shoreline for Spanish and Mexican Grants in Texas*, 38 TEX. L.REV. 523, 530 (1960) (citing Texas Surveyors Ass'n, *Report of Riparian Boundary Committee* (Mar. 21, 1957)), and about five to ten feet horizontally.

*This litigation.* In 2002, after Sonya Porretto's continued efforts to sell the property were unsuccessful, her parents sued the GLO and the Land Commissioner[19] to establish their ownership of the property conveyed to them and for damages for a taking. The plaintiffs did not limit their claims to the dry beach; their petition described the property in dispute as that which had been conveyed to them, on both sides of the MHHT line. The defendants denied the claims without limiting their denial to the wet beach. Notwithstanding the statements by the Land Commissioner and the Attorney General, who represented the defendants in the litigation, the defendants stated in a brief filed in 2003 that "the GLO asserts title to the disputed property and does so on behalf of the State of Texas."

[19] The plaintiffs also sued the Park Board and its executive director.

But then, in 2004, the parties settled, with the GLO agreeing to provide "a letter confirming that the State of Texas claims no ownership interest in [Porretto Beach] above the mean higher high water line". Not long after the agreement was reached, the GLO refused to produce the letter, the settlement failed, and the litigation resumed.[20] Defendants' counsel wrote to the trial court that "the State of Texas, **\*399** through its General Land Office, *does* claim title to the property at issue" (emphasis in the original).

[20] The letter was only one part of a settlement intended to facilitate development of Porretto Beach. The jury later found that the defendants had not failed to comply with the settlement.

**Porretto v. Texas General Land Office, 448 S.W.3d 393 (2014)**
57 Tex. Sup. Ct. J. 971

The trial court dismissed the action in 2005, based on the defendants' assertion of immunity, but the court of appeals reversed and remanded in 2007.[21] The court wrote, contrary to the defendants' claims to the Porrettos' property in the trial court, that the defendants had not "controvert [ed] the Porrettos' allegations of ownership of the land in question, and have challenged the Porrettos' claims without regard to the truth of their claim of ownership."[22] In their motion for rehearing, the defendants took issue with the court's statement:

[21]   *Porretto v. Patterson*, 251 S.W.3d 701, 705 (Tex.App.-Houston [1st Dist.] 2007, no pet.).

[22]   *Id.* at 709.

The majority opinion states that it is unclear whether the State claims the property at issue or disputes the Porrettos' title and notes the State Appellees' failure to present evidence on this point. However, such a showing was unnecessary. The Porrettos established the existence of a property dispute between the Porrettos and the State. The Porrettos' petition asserted that the State claimed title adversely to them, attaching the state-owned submerged land leases that evidenced the State's claim to own such land. The State Appellees did not challenge this allegation because it is true.

That motion was filed in January 2008. In May, following remand, defendants' counsel wrote plaintiffs' counsel that "the State does *not* claim title to any property [in Porretto Beach] that is above, or landward of, the mean higher high tide line." Referencing the 2001 letters from the Land Commissioner and the Attorney General, defendants' counsel stated that "the State's position has always been that it intended to claim only the state-owned submerged land", as reflected in the 2004 settlement. Counsel did not explain why, if that had always been the State's position, the GLO had refused to provide the letter to that effect promised in the settlement.[23]

[23]   The Porrettos added a claim for breach of the settlement agreement. The defendants contended at trial that their obligation to furnish a letter confirming the Porrettos' title above the MHHT line was never triggered because of the Porrettos' failure to perform their own obligations under the agreement. The jury failed to find that defendants breached the agreement.

**C**

The trial court granted summary judgment confirming the Porrettos' ownership of Porretto Beach and Porretto Beach West from the Seawall to the MHHT line. Following a bench trial, the court further declared the Porrettos to be the owners of the property seaward of the MHHT line, and held that the State's actions had resulted in a compensable taking. The court awarded the Porrettos $5.012 million as damages for the lost market value of the property taken, as found by a jury.

The court of appeals reversed and rendered, holding that the trial court should have dismissed the Porrettos' title claims for want of jurisdiction, and that the State's actions did not constitute a taking.[24] We granted the Porrettos' petition for review.[25]

[24]   369 S.W.3d 276, 286, 288–289 (Tex.App.-Houston [1st Dist.] 2011).

[25]   56 Tex. Sup.Ct. J. 612 (June 7, 2013).

**II**

**A**

[1]   Before we can determine whether the GLO's conduct constituted a compensable  *400 taking of the Porrettos' property, we must determine what property the Porrettos own. The answer is clear, and it was just as clear in 1994: the Porrettos own the property conveyed to them that lies landward of the MHHT line. The GLO has finally conceded this and now argues that because it has, no justiciable controversy remains, and the trial court therefore lacked jurisdiction over the issue. But given the GLO's tenacious dispute of the Porrettos' ownership before and during this litigation, in the face of *Luttes* and even after the Land Commissioner's and the Attorney General's written statements, the trial court was justified in resolving the issue once and for all. It erred, however, in awarding the Porrettos land seaward of the MHHT line, and the Porrettos concede that point. Under clear law and the parties' concessions, no title dispute remains. The law is equally well-settled that the Porrettos are entitled to judgment settling their title only against the Land Commissioner,[26] not against the GLO.[27]

**Porretto v. Texas General Land Office, 448 S.W.3d 393 (2014)**

57 Tex. Sup. Ct. J. 971

26   *See State v. Lain*, 162 Tex. 549, 349 S.W.2d 579, 581 (1961) ("When suit for recovery of title to and possession of land, filed without legislative consent, is not against the state itself, but is against individuals only, the mere assertion by pleading that the defendants claim title or right of possession as officials of the state and on behalf of the state, will not bar prosecution of the suit.... One who takes possession of another's land without legal right is no less a trespasser because he is a state official or employee, and the owner should not be required to obtain legislative consent to institute a suit to oust him simply because he asserts a good faith but overzealous claim that title or right of possession is in the state and that he is acting for and on behalf of the state."); *Tex. Parks and Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 393–394 (concluding that State officials' claims of State ownership—although not a constitutional taking—constituted "possession" for purposes of *Lain*, and remanding the case to the trial court to allow suit to proceed against "the governmental actors laying claim to the streambed" (citing *Lain*, 349 S.W.2d at 582; *see also id.* at 395 (Jefferson, J., concurring) ("In *Lain*, we made clear that a government actor is not immune from a trespass-to-try-title suit....").

27   *See id.* at 390 (holding that claims brought directly against the State to determine title to real property are barred by sovereign immunity).

Finally, it is clear that the ownership of shorelands is not changed by artificially adding sand, which the City of Galveston did in its renourishment project. The State does not gain the dry beach by dumping sand on it, nor does it lose what was before the wet beach, even if the renourishment pushes the MHHT line farther seaward, which is usually the purpose of renourishment.[28]

28   *Lorino v. Crawford Packing Co.*, 142 Tex. 51, 175 S.W.2d 410, 414 (1943) ("Accretions along the shores of the Gulf of Mexico and bays which have been added by artificial means do not belong to the upland owners, but remain the property of the State.").

**B**

**[2]**   The Porrettos argue that the GLO's claims have made it impossible for them to sell their property and therefore amount to a compensable taking. Specifically, the Porrettos point to the statements made by two GLO lawyers in 1997, the State's request for a change in the tax records to show it as the owner of the property, and the defendants' persistence

in a position at the beginning of this litigation contradicted by previous statements of the Land Commissioner and the Attorney General. With respect to Porretto Beach West, the Porrettos also complain of the State's leases of the property to the City of Galveston for beach renourishment and public recreation.

The GLO lawyers' statements regarding the State's ownership of property above the MHHT line were simply not binding **\*401** on the State. They were no more than expressions of their opinions, opinions later contradicted by their superiors. Even if they had been statements on behalf of the GLO itself, such assertions of ownership would not have constituted a taking in these circumstances. In *Texas Parks and Wildlife Department v. Sawyer Trust*, we concluded that a state agency's assertions of ownership of property did not of themselves constitute a taking of the property when the agency had not attempted to take possession of the property.[29] The Porrettos' contention would be stronger if the GLO had authorized its lawyers to assert claims to the property in bad faith with the goal of obtaining a benefit to itself.[30] But even though the lawyers' statements injured the Porrettos, as the jury found, and were erroneous, they did not rise to the level of a taking.

29   354 S.W.3d 384, 391–392 (Tex.2011).

30   *Cf. State v. Biggar*, 873 S.W.2d 11 (Tex.1994) (holding that the State's denial of a routine easement exchange in order to minimize the cost of condemning a larger tract amounted to a taking); *Taub v. City of Deer Park*, 882 S.W.2d 824, 826–827 (Tex.1994) (concluding that a city's failure to re-zone property was not a regulatory taking absent evidence that the city was acting for its own advantage); *Westgate Ltd. v. State*, 843 S.W.2d 448, 454 (Tex.1992) (declining to address "whether a landowner may state a cause of action for inverse condemnation where the condemning authority acts in bad faith to cause economic damage to the landowner").

**[3]**   Nor did the GLO's request to the taxing authorities to list the State as owner of the Porrettos' property. The decision to make the change rested with the taxing authorities. In *Hearts Bluff Game Ranch, Inc. v. State*, we concluded that the State's request that another government agency take action, without more, is not a taking because "[m]ere communications without authority are not actionable".[31]

31   381 S.W.3d 468, 489 (Tex.2012).

**Porretto v. Texas General Land Office, 448 S.W.3d 393 (2014)**

57 Tex. Sup. Ct. J. 971

Since reversing position in the trial court, the defendants have not explained the basis for their initial claim to ownership of the property above the MHHT line. But asserting and then abandoning a position in litigation is not itself a taking, especially when the assertion is unsuccessful.

[4]   Besides these actions by the GLO, with respect to Porretto Beach West, the Porrettos argue that the Renourishment Lease and the Recreation Lease covering property the State does not own constituted a taking. But the "exclusive purpose" of the Renourishment Lease was "the deposit of beach quality sand in and on said submerged land for beach replenishment and restoration", something which benefitted the Porrettos and to which they did not object." The Recreation Lease, too, did not injure the Porrettos, since they were already using their property for public recreation, and they make no claim for damages based on the Park Board's actions. Though the leases may have involved a claim of ownership by the State, the State did not attempt to exercise possession or control of the property to the Porrettos' exclusion.

The Porrettos argue that "States effect a taking if they recharacterize as public property what was previously private property", quoting from the United States Supreme Court's opinion in *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection.* [32] But *402 the recharacterization to which the opinion referred was, the littoral owners argued, effected by a state court's interpretation, in an administrative appeal, of a state statute. The statement has no application here.

[32]   560 U.S. 702, 130 S.Ct. 2592, 177 L.Ed.2d 184 (2010) (plurality opinion) (citing *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 163–165, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)) (concluding that the Florida Supreme Court's decision did not contravene the established property rights of petitioner's members).

We are mindful that Article I, Section 17 of the Texas Constitution requires compensation for private property "damaged" as well as "taken". And we find troubling the defendants' continued assertion of claims it later abandoned, having been made aware of the Porrettos' contention that those claims were impeding the sale of the Porrettos' property. But as we have said, mere claims do not rise to the level of action requiring compensation under the Constitution. We conclude that the Porrettos are not entitled to prevail on their taking claim.

**III**

Two issues remain.

[5]   First: The Porrettos challenge the constitutionality of the Open Beaches Act, contending that the City of Galveston's use of it to require a permit for sand scraping or removal operates ex post facto because they owned their property before the Act was passed. The court of appeals held that the Porrettos' as-applied challenge was not ripe because they have not shown that they have been denied the required permit or otherwise been refused permission for performing sand scraping. [33] The Porrettos have failed to show that any vested right has been injured or even threatened. [34] The court of appeals was correct.

[33]   369 S.W.3d at 289 (citing *Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 851–852 (Tex.2000)); *see also Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 929 (Tex.1998) (generally speaking, in order for "as-applied" due process and equal protection challenges to be ripe in a land-use regulation case, there must be a "final decision" regarding the application of the regulations to the property at issue); *cf. City of Dallas v. VSC, LLC,* 347 S.W.3d 231, 233 (Tex.2011) (holding the availability of a statutory remedy, that plaintiff failed to pursue, precluded a takings claim for vehicles seized by the city) ("In general, for a federal takings claim to be ripe, the owner of the allegedly taken property must (1) obtain a final decision regarding the application of the regulations to the property at issue from the government entity charged with implementing the regulations, and (2) utilize state procedures for obtaining just compensation.").

[34]   *See Gibson,* 22 S.W.3d at 852 ("A case is not ripe when determining whether the plaintiff has a concrete injury depends on contingent or hypothetical facts, or upon events that have not yet come to pass.").

[6]   Second: Porretto contends that the court of appeals erred by reversing the trial court's award of $19,349.52 in attorney fees and expenses as discovery sanctions against the defendants. Defendants agreed to produce documents requested by the Porrettos at the GLO's offices. While GLO lawyers did produce a substantial number of documents at the appointed time, they informed the Porrettos' counsel that no search for all responsive documents in the GLO's records had yet been made, nor would one be made without further specification of documents requested. The Porrettos'

**Porretto v. Texas General Land Office, 448 S.W.3d 393 (2014)**

57 Tex. Sup. Ct. J. 971

counsel were forced to make a second trip to the GLO's offices to review other documents. The Porrettos moved for attorney fees and expenses as sanctions, and defendants did not respond. After a hearing, the trial court awarded the Porrettos the sanctions requested. Defendants then moved for reconsideration, the Porrettos responded, and the trial court conducted two additional hearings. The trial court refused to set aside its order.

**\*403** Rule 196.3(c) provides that a party responding to a request for production "must either produce documents ... as they are kept in the usual course of business or organize and label them to correspond with the categories in the request." [35] Defendants argue that they produced the requested documents by allowing them to be retrieved from the vast records kept by the GLO, and the court of appeals agreed. [36] But the GLO's production of some records and its acknowledgment that it had more somewhere, for which it had made no search, was no response to the request. The Porrettos argued, and the trial court could have found, that this was not a situation in which defendants had located potentially responsive documents, even though voluminous, for the Porrettos' review, but was instead a situation in which the defendants had made no reasonable effort to locate responsive documents. Defendants argued to the trial court that the discovery request came late in the litigation, that it was broad, that all the documents were eventually tendered, and that at worst the problem was a miscommunication. But the defendants did not seek a more specific process for production in response to the request, and did not even respond to the motion for sanctions. The sanction was well within the trial court's discretion. [37]

[35]   TEX.R. CIV. P. 196.3(c).

[36]   369 S.W.3d 276, 289–290 (Tex.App.-Houston [1st Dist.] 2011).

[37]   *Cf. Chevron Phillips Chem. Co. LP v. Kingwood Crossroads, L.P.*, 346 S.W.3d 37, 78 (Tex.App.-Houston [14th Dist.] 2011, pet. denied) (concluding, without addressing the amount of the sanction, that the trial court did not abuse its discretion in basing an award on evidence indicating that litigant failed to produce all requested e-mails on a subject, and that litigant had communicated, at the outset of the search, that it did not intend to fully comply with an order issued to aid in discovery of e-mail); *Texaco, Inc. v. Dominguez*, 812 S.W.2d 451, 458 (Tex.App.-San Antonio 1991, orig. proceeding) (holding that the trial court did not abuse its discretion in ordering party to provide more responsive answers).

## IV

We reverse the court of appeals' judgment dismissing the Porrettos' title claims and denying discovery sanctions, affirm the judgment in all other respects, and remand the case to the trial court for rendition of judgment in accordance with this opinion.

Justice BOYD did not participate in the decision.

**Parallel Citations**

57 Tex. Sup. Ct. J. 971

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## APPENDIX B – PROPERTY DESCRIPTION

Tract A:
Lots Five (5), Six (6), Seven (7) in Block Six (6), in the City and County of Galveston County, Texas and only being all of those portions of the subject property lying South of the Seawall, together with that portion of the adjacent Street(s) and Alleys abandoned as set forth in Ordinance No. 78-46.

Tract B:
Lots Eight (8), Nine (9), Ten (10), Eleven (11), Twelve (12), Thirteen (13), and Fourteen (14), in Block Six (6), in the City and County of Galveston County, Texas and only being all of those portions of the subject property lying South of the Seawall, together with that portion of the adjacent Street(s) and Alleys abandoned as set forth in Ordinance No. 78-46.

Tract C:
The Southerly portion of Lot Ten (10) of Block Sixty-seven (67), all in the City and County of Galveston, Texas and only being all of those portions of the subject property lying South of the Seawall.

Tract D:
Lots One (1), Two (2), Three (3), in Block Seven (7), in the City and County of Galveston, Texas, and only being all of those portions of the subject property lying South of the Seawall.

Tract E:
Lots Eight (8), Nine (9), and Ten (10), in Block Seven (7), in the City and County of Galveston, Texas and only being all of those portions on the subject property lying South of the Seawall.

Tract F:
Lots Eight (8), Nine (9), Ten (10) and Eleven (11), in Block Eight (8), in the City and County of Galveston, Texas, Lots Seven (7), Eight (8), Nine (9), Ten (10), Eleven (11) and Twelve (12), in the Northeast Quarter of Out Lot Twenty-four(24), One (1) through Fourteen (14), inclusive, in the Southeast Quarter of Out Lot Twenty-four (24), Lots One (1), an interest in Lot Two (2), Three (3) through Fourteen (14), inclusive, in the Northwest Quarter of Out Lot Twenty-Five (25), Lots One(1), Through Fourteen (14), inclusive in the Northeast Quarter of Out Lot Twenty-five (25), Lots One (1), Through Fourteen (14), inclusive, in the Southwest Quarter of Out Lot Twenty-five (25) and Lots One (1), Through Fourteen (14), inclusive, in the Southeast Quarter of Out Lot Twenty-five (25), Lots One (1) through Fourteen (14) in the Northwest Quarter of Out Lot Fifty (50) and the entire Northeast Quarter of Out Lot Fifty (50), all in the City and County of Galveston, Texas, and only being all of those portions of the subject property lying South of the Seawall, together with that portion of the adjacent Street(s) and Alleys abandoned as set forth in Ordinance No. 78-46.

## APPENDIX B – PROPERTY DESCRIPTION

Tract G:
The Southeast Quarter, of Out Lot Forty-nine (49), all in the City and County of Galveston only being all of those portions of the subject property lying South of the Seawall.

Tract H:
The Southwest Quarter of Out Lot Forty-nine (49), all in the City and County of Galveston only being all of those portions of the subject property lying South of the Seawall.

Tract I:
Lots Eight (8), through Ten (10), inclusive, and the East one-half (1/2) of Lot Eleven (11), in the Northeast Quarter of Out Lot Forty-eight (48) all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall.

Tract J:
The Northwest Quarter of Out Lot Seventy-two (72), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

Tract K:
The Southwest Quarter of Out Lot Seventy-two (72), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

Tract L:
The Southeast Quarter, of Out Lot Seventy-One (71), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

Tract M:
The Northeast Quarter of Out Lot One hundred-nineteen (119), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

Tract N:
The Southeast Quarter, of Out Lot One hundred-nineteen (119), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

Tract O:
Part of Lots Eight (8) through Thirteen (13), inclusive, of the Northwest Quarter of Out Lot One hundred forty-one (141), all in the City and County of Galveston

Page 2

## APPENDIX B – PROPERTY DESCRIPTION

and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

Tract P:
Lots One (1) through seven (7), inclusive, of the Southwest Quarter of Out Lot One hundred forty-one (141), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.

Tract Q:
Lots Eight (8) through Fourteen (14), inclusive, of the Southwest Quarter of Out Lot One hundred forty-one (141), all in the City and County of Galveston and only being all of those portions of the subject property lying South of the Seawall, based on the Map of the City of Galveston in common use.



**APPENDIX C**





CAUSE NO. 02CV0295

JAN 1 2009

HENRY P. PORRETTO, JR. et al.                §          IN THE DISTRICT COURT OF

    Plaintiffs,                                        §
                                                    §
VS.                                                     §
                                                    §          GALVESTON COUNTY, TEXAS
                                                    §
DAVID DEWHURST, Commissioner of the     §
Texas General Land Office, et al.               §
                                                    §
    Defendants                                      §          212th JUDICIAL DISTRICT

**ORDER SANCTIONING JERRY PATTERSON, IN HIS CAPACITY
AS LAND COMMISSIONER AND THE TEXAS GENERAL LAND OFFICE**

Before the Court is Plaintiffs' Motion for Sanctions and to Compel Discovery Responses
of Jerry Patterson, in his capacity as Land Commissioner and the Texas General Land Office
(collectively, "State Defendants").

The Court has considered the parties' claims, evidence, and the arguments of counsel
and finds that the Motion has merit. It is, therefore, the ORDER of the Court that Plaintiffs'
Motion for Sanctions and to Compel Discovery Responses of Jerry Patterson, Land
Commissioner and the Texas General Land Office is hereby GRANTED.

Therefore, it is ORDERED that Jerry Patterson, Land Commissioner the Texas General
Land Office, and their counsel are also SANCTIONED in the following ways:

1. State Defendants are required to reimburse Plaintiffs $19,349.52 for attorneys' fees
and expenses, consistent with the affidavit of Lucie Tredennick, filed with the Court January 9,
2009, for traveling to and from Austin on December 29, 2008 and January 6, 2009, for the time
to draft Plaintiffs' Motion for Sanctions and to Compel Discovery Responses of Jerry Patterson,
Land Commissioner and the Texas General Land Office, and for the costs of sending those
documents via overnight priority delivery.

221216                                     1                         **APPENDIX D**

1184

2.  State Defendants are also responsible for the costs of copying all responsive documents requested by the Plaintiffs.

DONE this ___16___ day of _____Jan_____, 2009.

_____
Hon. Susan Criss
Presiding Judge



LATONIA D. WILSON
CLERK DISTRICT COURT
FILED

JAN 16 2009

GALVESTON COUNTY, TEXAS
BY _____ Deputy

221216

2.

1185

21.1

### PORRETTO BEACH RULES

Thank you for visiting Porretto Beach Park. This is not a city or state owned beach we are a family owned and operated business.  Please respect other visitors of the park and their families.
To help provide a safer environment we ask that you abide by the following rules:

1.) No private tents or umbrellas due to unpredictable winds and damage caused by 'non-commercial' tents or umbrellas

2.) No disorderly conduct, drugs, guns or knives

3.) Automobiles must stay behind the wooden bollards in the designated parking area

4.) Do not move, close, open or manipulate the umbrellas, They are carefully adjusted accordingly with wind variation

5.) All pets must be kept on a leash and must be picked up after

6.) All trash should be placed in the trash receptacles

7.) Respect the water safety rules and warnings posted by the Beach Patrol

8.) In case of an emergency please call 911

If there are any complaints please forward them to the mail box at the our Website PORRETTOBEACH.COM

THANK YOU AND HAVE FUN!



PLAINTIFF'S
EXHIBIT
21
3:21cv0295

APPENDIX E











I, John D. Kinard, District Clerk and Custodian of Records for District Courts of Galveston, County, Texas do hereby certify that the foregoing is a true and correct copy of the original record, now in my lawful custody and filed in this office on the _____ 9th _____ day of _____ April _____ 2015 witness my official hand and seal of office this _____ 9th _____ day of _____ April _____ 2015

JOHN D. KINARD, DISTRICT CLERK
Galveston County, Texas
By _____ Deputy